CITY OF BUFFALO v. DELAWARE, L. & W. R. CO.

(Supreme Court, Special Term, Erie County. April, 1895.)

1. RIPARIAN OWNERS—RIGHT TO CONSTRUCT WHARVES.
     A riparian owner has the right to construct wharves on his water front for his own use and benefit, subject to public regulation, and such right cannot be taken for public use, except by condemnation proceedings, as prescribed by law.

2. DEDICATION—PROPERTY SUBJECT TO—WHARVES.
     Riparian owners have a right of property in wharves, which they may dedicate to the public.

3. SAME—LIMITING EASEMENT OF PUBLIC.
     One who dedicates property to the public may limit the easement as to duration and use.

4. SAME—PROOF OF DEDICATION.
     On an issue as to whether riparian owners had dedicated certain wharves in defendant city to the public, it appeared that, about 60 years

before, a road ran along the river front where the wharves were con-- structed, but it was not shown under what circumstances the roadway was used, or the condition of the land in the vicinity. Afterwards the owners of the premises erected warehouses and buildings for use in con- nection with the wharves. The evidence showed that it was not the inten- tion of the owners to construct wharves for the purpose of a public high- way. It also appeared that wagons and carriages drove on and off the wharves at pleasure, without objection from the owners or occupants of the warehouses; that the business done about the wharves subsequently increased so largely that the upper stories of the warehouses were con- verted into offices, and that the board of trade of the city located its office there. The wharves were always used in connection with the business of the owners of the property, and whatever wharfage was realized was retained by them for their own use.. The city had made the place where the wharves were located a lamp district, and lighted it by taxation, in the same manner as other portions of the city. *Held*, that there was not a dedication of the wharves for public use.

5. SAME—FILING MAP.
Where the owner of land makes a map, showing lots, streets, publiϲ squares, etc., and sold by reference to the map, it will be presumed that he- intended to dedicate to the public the streets, etc., appearing thereon.

6. SAME—ACCEPTANCE.
Where the owner of land made and filed a map showing lots, streets, etc., and the legislature afterwards passed an act incorporating the dis- trict covered by such map into a village, there is an acceptance of the streets as laid down on the map.

Action by the city of Buffalo against the Delaware, Lackawanna & Western Railroad Company to compel defendant to remove its warehouses and other structures from a location about 30 feet wide along the margin of Big Buffalo street, between Commercial and Main streets, known as "Central Wharf," and between Main and Washington streets, being a distance of something less than 1,000 feet, and to have such territory declared a public highway, and to have the piers, wharves, and docks erected and existing along the same declared to be public piers, wharves, and docks, and to re- strain the defendant from maintaining any obstruction in such ter- ritory.

Frank C. Laughlin and William F. Mackey, for plaintiff.
Rogers, Locke & Milburn, for defendant.

LAMBERT, J. It is conceded by the pleadings that about the year 1805 Wilhelm Willink and others, as joint tenants, commonly known and described as the Holland Land Company, owned all the land now included within the present limits of the city of Buffalo, which includes the premises in controversy, and that prior to the year 1807 the said Holland Land Company caused a portion of said property to be surveyed, laid out, and subdivided into lots, streets, highways, and squares, and caused a map or plan thereof, showing such lots, streets, and squares, so surveyed and laid out, to be made by Joseph Ellicott, as a plan and survey of New Amsterdam, and filed the same in the office of the clerk of Niagara county, that being the county in which the premises were located at that time. By this map it appears that a street was laid out, commencing at the inter- section of the present Main street with Buffalo river, and extending along the margin of the river, the width of one chain, to South street,.

and designated thereon "Water Street"; also another street, beginning at the southerly termination of the present Pearl street, and running southwesterly along Little Buffalo creek to Big Buffalo creek, and to a point now known as the "Evans Ship Canal." The territory between Main and Washington streets was known on said map as "Lot 78," and between Main street and now "Commercial" street "Lots 84 and 85." It will be observed that a street was laid out or designated, one chain wide, between the margin of Buffalo river and the southerly line of lot 78, as plotted and designated on such map, while the southerly boundary of lot 84 and a small portion of 85 is the Buffalo river. The territory now occupied by the defendant is that along the margin of Buffalo river on the southerly line of lots 78, 84, and 85, and between the westerly side of Washington street and the easterly side of Commercial street, except the space occupied by the junction of Main street and Buffalo river. By the map referred to, no evidence of an intent is manifested by the Holland Land Company to lay out or dedicate a street or public highway at the southerly terminus of lots 84 and 85, but the same may not be said with respect to lot 78, for a street was there plotted and tendered to the public, one chain wide, from the intersection of Willink's avenue (now Main street) to South street, and thereafter sanctioned and accepted by chapter 106 of the Laws of 1813, in creating the village of Buffalo as a corporate body; and such and other proceedings had in relation thereto, both by the town and village authorities, prior to the incorporation of the plaintiff, necessitate the consideration of the questions that arise in respect to the two localities separately. Much of the record evidence makes reference to the situation over the entire water front, from the Evans Ship Canal to South street, but in disposing of this case it will be only necessary to refer to the same, and the evidence given, so far as it relates to and controls the legal consequences that must be applied to the territory directly in controversy.

We come now to the question whether the dock known as "Central Wharf," between Main and Commercial streets, is a public highway. There is no pretense that the city has title to the fee of the premises in controversy, as this property was owned by the Holland Land Company, and by the first deeds of conveyance of outer lots 84 and 85 they were described as bounded on the southerly side by Buffalo creek, and in all of the conveyances thereafter made, down to the acquisition of title by the defendants' lessor, the property was described by like descriptions; so that from the earliest history the fee of the property under consideration has been in the owners of lots 84 and 85, so that, if this territory ever became a highway, support for it must be found in some one of the ways defined by the law. In City of Cohoes v. President, etc., Delaware & H. Canal Co., 134 N. Y. 402, 31 N. E. 887, the court said that public highways may be created in four ways: (1) By proceedings under the statute. (2) By prescription, based on adverse user by the public. (3) By dedication through offer and implied acceptance, or where the owner throws open his land, intending to dedicate it for a highway, and the public use it for such a length of time that they would be seriously incon-

venienced by an interruption of the enjoyment. This rests upon the principle that the owner is estopped from revoking his offer after the public have acted upon it for so long a period that it would be a fraud upon them if he were permitted to do so. No particular length of time is required to effect such a dedication, as every case of an estoppel in pais necessarily depends upon its own facts. (4) By dedication through offer and formal acceptance.

The first position assumed by the plaintiff is that the territory in question (which shall, for convenience, be hereafter mentioned as "Central Wharf") was, by virtue of proceedings taken by the municipal authorities, under the charter formally and legally laid out as a highway. In December, 1837, a resolution was passed, of which the following is a copy:

"That all the docks and wharves on the north side of the Big Buffalo creek in the city, commencing at the Evans slip, and extending up the creek to the bridge, shall hereafter be built, constructed, and repaired, or rebuilt, under the direction of the common council, as a public highway; that the city surveyor, with the assistance of the street commissioner, be, and he is hereby, directed to survey and ascertain the front line for the said docks and wharves on the said creek, and their elevation or height, fixing the line where docks now are, or heretofore have been, erected, as nearly as may be, at the front of those docks, and ascertaining and making the height or elevation for said docks or wharves at said front line at least six inches above where the highest floods of water in said creek during the year 1837 have reached. And it is hereby further resolved that the standing committee on streets, wharves, and public grounds be, and are hereby, appointed a special committee, and that, as such committee, they are directed to prepare and report to the next meeting of the council a plan for the erection of said docks and wharves, and the raising and improving of the streets near said docks and wharves, in the First ward of the city."

After the passage of this resolution, no action seems to have been taken under it, although both before and after the common council passed various resolutions, among them one fixing a dock line along the waters of Big Buffalo creek, and providing for a uniform height, and regulating the materials to be used in the construction of docks and wharves, not necessary to be more specifically mentioned in this connection. On April 30, 1839, the following resolution was adopted:

"Resolved that the street commissioner be directed to ascertain the width of space, if any there be, between the right of each individual or company, by deed or otherwise, and the outer line established for the building of wharves, on the north side of Big Buffalo creek, within this city, and report to the council as soon as practicable."

Thereafter, and on March 5, 1840, the street commissioner reported a map and survey of the line of lots on the northerly bank of Buffalo creek between Main street and Commercial slip, showing a space of from 25 to 30 feet wide. Thereupon, and upon March 7th of the same year, this survey was ratified, and the map ordered filed with the city clerk, and the following resolution was passed and recorded in the record book of streets:

"Resolved that the space between the outer lines of the wharves, and the northerly line of Big Buffalo creek and the southerly line of lots fronting said wharf, between Main and Commercial streets, as reported by the street commissioner, is, and the same is declared, a public highway, the same to be a continuation of Front street."

These resolutions, and the proceedings had under them, constitute the only action ever taken by the town, village, or city authorities to open or lay out a highway or street along the margin of Big Buffalo creek between Commercial and Main streets, and the legal effect of such proceedings is presented for consideration. Big Buffalo creek was then a highway by statute, and the fee of the land of all of lot 84 and a very little of lot 85 was in individual owners, and the space in controversy was substantially all occupied by docks erected by the owners of the upland. The only power possessed by the city to lay out or declare a highway was derived from the legislature, and was contained in its then charter. The city was incorporated by chapter 179 of the Laws of 1832, and, as amended by chapter 60 of the Laws of 1833, the common council was created commissioner of highways in and for the city, and was given power to lay out, make, and open, regulate, repair, amend, alter, and clean streets, alleys, highways, piers, docks, and slips of said city, and to prevent the incumbering thereof by vehicles or otherwise, and to prevent encroachments thereon, and to establish, erect, and maintain wharves, docks, and slips in the city. Undoubtedly, under the authority thus conferred, the city could lay out, make, and open streets in the manner thus pointed out by the charter. It was further provided that the common council should give notice of its intention to appropriate the land necessary for such proposed highway by publication, and provision was made for the appointment of commissioners to assess damages, and it was specifically provided that the land was not to be taken and appropriated until the damages were paid. These were the statutory requirements to be followed in the year 1840 in laying out a street, and acquiring the necessary land for such purpose. The validity of municipal action in that respect required strict compliance with the provisions of the charter. People v. Village of Whitney's Point, 102 N. Y. 81, 6 N. E. 895.

It needs no discussion to demonstrate that the provisions of the charter referred to furnish no support for the validity of the proceedings taken to make and lay out a public street from Commercial to Main street, as is now contended was done. A simple resolution adopting the report of the street commissioner of a survey and plan of a proposed public highway, entering the same of record, and declaring the same to be a public highway, is lacking in every essential particular to accomplish the purpose aimed at, except the misdirected purpose of the common council. The unusual and peculiar situation of the property sought by public action to be converted into a street by the proceedings had cannot be reasonably urged to change the rule that should be applied. The proposed highway was sought to be located between the southerly line of the buildings erected on lot 84 and the outer edge of the docks connecting the buildings thus constructed with Buffalo creek, and erected, used, and maintained by the several owners for a considerable number of years. If it ever was doubted, it is now settled by authority, that the owner of property fronting on a navigable stream has a right, as such riparian owner, to construct a wharf into the river for his own use and benefit, subject to public regulations. It is

known and protected by the law as a property right. In Yates v. Milwaukee, 10 Wall. 497, it is said:

"This riparian right is property, and is valuable, and, though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary that it be taken for the public good, upon due compensation."

The doctrine of that case is supported by the following authorities: Illinois Cent. R. Co. v. Illinois, 146 U. S. 387, 13 Sup. Ct. 110; St. Louis v. Rutz, 138 U. S. 226, 11 Sup. Ct. 337; Railroad Co. v. Shurmeir, 7 Wall. 272; Rumsey v. Railroad Co., 133 N. Y. 79, 30 N. E. 654; Saunders v. Railroad Co., 144 N. Y. 75, 38 N. E. 992. We are cited to no case holding a contrary doctrine except Gould v. Railroad Co., 6 N. Y. 522. It was there held that the owner of lands on the Hudson river had no private right or property in the waters or the shore between high and low water mark as against a grant from the state to a railroad to occupy the margin of the river. This rule has been repudiated and overruled by the cases above cited. The principle announced and applied by all the cases except the Gould Case is that the right of the riparian owner is property that cannot be taken, limited, or impaired, except for purposes reserved to the state or the federal government, and that the owner of the upland fronting a navigable stream has the right to unite his title with an easement in the navigable waters, for his individual use and benefit, and that this right constitutes such a right of property as cannot be taken without just compensation. From these views it is apparent that the proceedings taken by the common council of the city of Buffalo, between and inclusive of the years 1837 and 1840, were ineffectual, for noncompliance with statutory requirement, to convert the docks in Central wharf into a public highway. The subsequent acts of the plaintiff, consisting of resolutions running through a period of many years, of renumbering Front street between Main street and the Evans Ship Canal, and extending the lamp district over the territory in question, and directing portions of Front street to be repaired by planking, and ordering assessments for lamp-posts and gas, cannot aid the proceedings taken to declare the locus in quo a street by statutory authority. The proceedings taken subsequent to 1840 equivocally treat the territory in controversy as a wharf and a street, and undoubtedly might properly be considered on the question of whether a street was created by prescription or user, but on the question of whether this was laid out as a highway, under the charter, these official acts and resolutions can have no creative force; they indicate only that the city authorities assumed a street to exist. It follows, from the views here taken, that the proceedings of the common council of the city of Buffalo were ineffectual to convert the row of docks from Commercial to Main street into a highway upon statutory grounds.

We now come to the question whether the locus in quo became a dedicated highway in any manner sanctioned by law. As before shown, the space in question consists of a row of docks between and connecting the buildings on lot 84 with the waters of Big Buffalo

creek, of the width of about 30 feet. The plaintiff makes the alternative claim that this row of docks became a public highway by dedication and user, and, if not, then the docks and wharves became public docks and wharves by the operation of the same concurring circumstances as would operate to establish a legal highway. I see no objection to treating the two questions as one, provided docks and wharves can be made the subject of dedication, and thus acquired by user or prescription. Upon principle there seems to be no objection to the application of the same consequences, whether the right of way be over land or consist of wharves for public purposes. Especially is this made apparent when, as we have seen, wharves, and the rights incident thereto, are vested property rights, and surrounded by the same safeguards, when sought for public or private purposes, as are applicable to purely landed estates. It is said in Langdon v. Mayor, etc., 93 N. Y. 150:

"The right of wharfage is an incorporeal hereditament, of which the proper mode of conveyance by common law was a grant."

In Wetmore v. Gaslight Co., 42 N. Y. 384, it is said:

"The question to be determined is whether the wharf was the private property of the defendant, from which, as such, it had the right to exclude the public from any use, either with or without the payment of wharfage, or whether the public had the right to its use for loading and unloading vessels. The plaintiff entirely failed to show any dedication of the wharf to public use, either by the defendant or any of its predecessors in the title."

The inference from this citation is clearly permissible that the court recognized such a right of property in wharves and wharfage rights as could be made the subject of dedication, and to the same effect is Langdon v. Mayor, etc., 93 N. Y. 129; Gardiner v. Tisdale, 2 Wis. 188; Barclay v. Howell's Lessee, 6 Pet. 498; Holmes v. Railroad, 8 Am. Law Reg. 716; Coolidge v. Learned, 8 Pick. 504. Thus is appears the question in its twofold aspect may be considered together. There is no claim, nor could there well be, that the plaintiff acquired any right to the wharf by proceedings of condemnation under the charter, as the evidence does not disclose that any were ever taken, except those already adverted to as having taken place between 1837 and 1840. Neither is it claimed that any right to the wharves was acquired as public wharves, or as a public right of way thereon, by prescription, for the obvious reason that whatever use the same was subjected to by the public was with the concurrence, or, at least, the assent, of the owners of the property abutting the river. The case is brought to the inquiry principally whether there ever was a public highway or public wharf at the place in question, and, if so, then I assume it must have been created through dedication and acceptance. Dedication implies an intent upon the part of the dedicator to grant to the public an easement, and it may be manifested by a writing, map, or other unmistakable evidence of purpose; and to give validity to the dedication it must be accepted by formal act, or implied from user. City of Cohoes v. President, etc., Delaware & H. Canal Co., 134 N. Y. 401, 31 N. E. 887; Speir v. Town of Utrecht, 121 N. Y. 420, 24 N. E. 692; Driggs v. Phillips, 103 N. Y. 77, 8 N. E. 514; People v. Loeh-

felm, 102 N. Y. 1, 5 N. E. 783; Bridge Co. v. Bachman, 66 N. Y. 261. Where dedication is tendered by a written instrument, or manifested in unequivocal evidence, acceptance may be accomplished by formal act of the public, and time is not essential to its validity, or acceptance may be accomplished by user for such a period that it would be a fraud upon the public to allow the easement to be defeated. These conclusions seem to be the inherent doctrine of the prevailing authorities in this state. The dedication being in the nature of a gratuity, any condition, qualification, or limitation attached to, or imposed upon, the grant, has been upheld by numerous authorities. Id. 269; Irwin v. Dixion, 9 How. 30.

It is elementary that the public can take only that which is the subject of the donation, and a limitation of the easement to given purposes, as well as conditions imposed, to be operative at the election of the owner of the grant in the future, has been sustained by the American and English courts. The doctrine of partial or qualified dedication was directly involved and enforced in the following cases: Cornwell v. Commissioners of Sewers, 10 Exch. 771; Le Neve v. Vestry of Hamlet of Mile End Old Town, 8 El. & Bl. 1054; Morant v. Chamberlin, 6 Hurl. & N. 541; Fisher v. Prowse, 2 Best & S. 771; Robbins v. Jones, 15 C. B. (N. S.) 221; State v. Society for Establishing Useful Manufactures, 44 N. J. Law, 502; Ayres' Case, 48 N. J. Law, 44, 3 Atl. 885; Id., 52 N. J. Law, 405, 20 Atl. 54. In the absence of expressed and formal dedication and acceptance, dedication and acceptance may be effectuated by the acts, declarations, and acquiescing conduct of the parties through such a period of time as will give rise to the conclusive inference of intent to dedicate and accept. Cook v. Harris, 61 N. Y. 448; People v. Loehfelm, 102 N. Y. 1, 5 N. E. 783; Flack v. Village of Green Island, 122 N. Y. 107, 25 N. E. 267.

When we admit the rule, as derived from the cases, that the public can take only that which is given, it follows, as a logical result, that an easement to the public may be limited as to duration, and the purposes for which it may be devoted by the public. In applying the facts as they may be found from the evidence given, it is essential that the two rules of law last stated be kept in mind: (1) That the dedication and acceptance may be predicated upon the acts, conduct, and declaration of the parties, and (2) that the owners of Central wharf had the undoubted right to limit the easement, if any, conferred upon the public, as to duration, and the purposes to which it might be used. From 1805 up to about the 40's the evidence is rather meager respecting the use of Central wharf. It does appear, however, from the testimony of Mr. Bidwell and others, that from about 1828 up to and during the 30's, and before the erection of the buildings on lot 84, a dirt road was traversed by vehicles along the margin of Big Buffalo creek, from a point now known as Commercial street, as far east as South street; but it is not shown under what circumstances this roadway was used, nor the condition of the land in the vicinity of the territory traversed, and the rule is applicable to this situation as expressed by Earl, J., in Re Rhinelander, 68 N. Y. 107: "The passage by the public over open, waste,

useless land for years would furnish. but little, if any, evidence, of itself, that the locus in quo was a street." From 1830 to 1840 the owners of lots on lot 84 had erected warehouses and buildings used for offices and matters of trade incident to the business of lake navigation. Up to this time the principal business transacted was the receipt of produce and merchandise, and its storage on the docks or warehouses contiguous thereto. The extent of the business carried on prior to 1840 is left to some extent in doubt, but sufficient appears to negative the inference of fact that it was the intention of the owners of the property to construct docks in front of their several properties, for the purposes of a public highway. It would be presumptuous to assume, under the circumstances disclosed by the evidence, that, by the erection of the docks by the several owners for use in connection with their buildings, they intended thereby to dedicate the space covered by them to the public for a highway. The mere statement of the proposition carries its own answer. Undoubtedly the proceedings of the common council of March, 1840, were sufficiently inclusive to have worked an acceptance of Central wharf as a street by the city; but they were ineffectual for such purpose, for the obvious reason no easement had been tendered. Before 1850 the entire property on lot 84 had been improved by the erection of buildings, with docks connecting them with the river, the lower stories of which were generally used as warehouses for the receipt and storage of merchandise and products, carried by vessels from the west, either for transportation east by means of the canal or railroad, or consumption in the city of Buffalo. That during this period large numbers of people were carried west by means of boats owned and operated by individuals and private corporations, and many of them received and discharged passengers at the docks along Central wharf. That in connection with such lake transportation of passengers, carriages and supply wagons drove on and off Central wharf frequently, and at pleasure, without objection or interference from the owners or occupants of the warehouses. That in connection with the traffic of merchandise and other products, grocery and other supply wagons and drays drove into and upon Central wharf at any point along the same, as the business bringing them there required, frequently passing through one or more of the warehouses, which was permitted without objection. It also appears that at least one ship chandler's store was located there at this time. Towards the end of the 50's causes were in operation which introduced new elements into the business transactions on Central wharf. Western production increased, and Central wharf became more important as a transfer from lake to canal and railroads; sail and steam boats gave way to propellers of much greater capacity. As a consequence, the warehouse and storage business was united to, or absorbed by, purely commission business. At about this time the upper stories of the buildings were converted into offices, where most of the business was transacted. This commission business had assumed such proportions that the board of trade of the city of Buffalo located its offices in Central wharf, and had built a balcony extending along the entire length of the building occupied by it, some 14 or 15 feet

over the dock, and supported by posts on the outer edge, resting upon the wharf.  Stairs were built at the outer edge of the balcony, running parallel with the building, to furnish access to and with the wharf below.  By degrees, and within at least two years, this balcony was extended from Main street to Commercial slip, of the width of only 10 or 12 feet, and resting upon posts on the outer edge, which extended to the docks below.  The offices in the second story opened upon the balcony thus erected, and were occupied by commission merchants, insurance agents, brokers, canal forwarders, and others, while the lower stories, communicating with the docks, were used in connection with the business at the docks, and which had largely decreased, as compared with the business carried on before the 60's.  This situation continued, with slight varying conditions, up to the year 1883, when the defendants' lessor went into the possession of the entire property known as Central wharf, and the buildings between it and Prime street.  During all this period of time, and in fact from the earliest history given of Central wharf, the public was at liberty, either for business or pleasure, to go upon and traverse Central wharf, on foot or by vehicle, without let or hindrance.  That during the entire time, in connection with the business transacted at Central wharf, the travel by lake, and for pleasure, throngs of people were gathered upon Central wharf almost daily.  On the east Central wharf intersected Main street; on the west it was bounded by Commercial slip, over which there was no means of travel for vehicles, and only a portion of the time mentioned for foot travelers.

From the vast amount of evidence given in this case, the summary here generalized is a fair account of the purposes to which Central wharf was devoted up to the year 1883.  The nature of the business transacted, when the extent is known, would clearly indicate the character of the public use of Central wharf during the period covered by the evidence.  During the period referred to, undoubtedly there was more business transacted upon Central wharf than upon any other street in the city of Buffalo, and it, of necessity, called large numbers of people to that point, who were permitted to use it to the extent, and with the freedom, allowed in any of the streets of the plaintiff.  But this was not all that was required to constitute this row of docks a public highway.  Within the cases there must be some clear, positive, unequivocal evidence of an intention to abandon the wharves as private property, and surrender them to the public for highway purposes.  The occasion for the erection of these docks was not for highway purposes, but for use as a part of, and in connection with, the business to be transacted by the owners of the property abutting the river; and the evidence, although in conflict in characterization, is unvarying in its trend to the effect that the docks on Central wharf were always used in connection with the business of the owners of the property, and whatever wharfage was realized from their use was claimed and retained by the occupants of the property abutting the same.  The central fact to negative the inference of an intent by the owners of Central wharf to abandon this property as individual owners is without dispute, and that is

that they at all times continued to use and occupy the docks in connection with the business transacted in the buildings fronting the same. The indiscriminate use by the public of these wharves, in connection with the individual use thereof by the proprietors, under such circumstances, has been frequently held, as matter of law, to be fatal to the claim of the public to territory thus used, based on user as evidence of dedication and acceptance.

In Irwin v. Dixion, 9 How. 10, the court, in writing the opinion, says:

"While, then, anybody might be allowed to travel over this space from the warehouse east to the wharf and river, when convenient, and not injuring the owner, it would not be because it had been intended to give to the public a right of way over these premises, but because he himself intended to travel over it, and, while so doing, and so leaving it open, would not be captious in preventing others from traveling there. This was not meant to give to others any exclusive rights or privileges there, but merely a favor, in subordination to him and his rights, as will be clear from various other circumstances during the twenty or thirty years."

The doctrine announced in Shellhouse v. State, 110 Ind. 509, 11 N. E. 484, that a private way, opened by the owners of land through which it passes for their own uses, does not become a public highway merely because the public is also permitted for many years to travel over it, has been quoted with approval in this state.

In Pearsall v. Post, 20 Wend. 135, the court makes use of this language:

"I will merely add, upon the main question, that, considering our extensive lines of coast,—immense when we take into account our seas, lakes, and rivers; the long public enjoyment throughout of landings on mere courtesy, and under the motion, I am persuaded, of mere license, revocable when the resort should become inconvenient; considering the like circumstances in respect to other objects, such as watering places at the shore, and in the creeks, springs, and wells,—a rule of law which should admit the possibility of turning such enjoyment into prescriptive and absolute right on the part of the public would open a field of litigation which no community could endure."

In Speir v. Town of Utrecht, 121 N. Y. 420, 24 N. E. 692, the court say:

"The user need not be adverse, and under such circumstances as would be required to give an individual a right of way by prescription. If such had been the intention, other language would, we think, have been used. All we have here is that 'the road was used by the public generally.' But the mere fact that a portion of the public travel over a road for twenty years cannot make it a highway, and the burden of making highways and sustaining bridges cannot be imposed upon the public that way. There must be more. The user must be like that of highways generally. The road must not only be traveled upon, but it must be kept in repair, or taken in charge and adopted, by the public authorities."

There is evidence in this case that repairs were made, or caused to be made, on the docks along Central wharf subsequent to 1833, but those repairs were made, as the proceedings indicate, as wharves, and not as a public highway, and may be referred to on the question of whether the docks at Central wharf ever became public docks and wharves.

Much stress is laid by the plaintiff upon the act of the common council, in about 1853, of bringing Central wharf into one of the

lamp districts of the city, and of thereafter lighting it by taxation, in the same manner as other portions of the city are lighted, upon the petition of John Pease & Co. and others, as an overt act, and an expressed declaration of an intention upon the part of those signing the petition to surrender and dedicate Central wharf as a public street.    There might be force in the position if it appeared that the owners of the property of lot 84 were the petitioners; but, so far as the proof discloses, the petition may have been made by persons without the right to make any concession respecting the property in controversy to the public.

The conclusion reached upon this branch of the case is that Central wharf was thrown open to the public by the owners of lots 84 and 85, to be used by the public in connection with the business transacted at Central wharf, and that the user by the public must be held to be in subordination to the primary use of the locus as a wharf.    When the conditions ceased out of which the public use arose, the public right would also cease.    Any easement that the public may have acquired was limited to the period of the continuance of the business out of and in connection with which the right arose.    The terminating event having happened, there would no longer be any foundation for the continuance of the easement for highway purposes.

The views already expressed applicable to the property rights in wharves, and the undoubted right of the owners of the upland to connect their estates with an easement in navigable waters, as well as the failure of the city to acquire the docks in Central wharf by condemnation, lead to the result that the docks on Central wharf never became public docks.    They were built by the individual owners of the upland, and by them and their successors in title used in connection with their private business; and the wharfage charges were retained by the individuals owning or occupying the dock or docks fronting upon the several buildings upon lot 84, from the time of their erection until the present.

It is in evidence that the city erected the docks and wharves at the foot of Main, Washington, and several other streets, and maintained them and fixed the wharfage rates to be paid by the owners of vessels and boats using or occupying the same, while no attempt seems to have been made to regulate the charges to be paid for dock service in Central wharf, which permits the inference that the plaintiff did not, during the period mentioned, regard Central wharf as a public wharf.

It is also made to appear that the city was given the authority, by its charter of 1832, and as thereafter amended in 1837, to erect and maintain docks, and to remove obstructions therefrom, and to make or cause repairs to be made thereon, and thereafter, from about the year 1837, at various times, the common council, by resolution, directed repairs to be made on the docks upon Central wharf by the owners or occupants thereof, and for a failure so to do that the same be done by, or under the direction of, the street commissioner of the city, and the expense charged to the owners, or, in some instances, assessed to the property benefited by such expenditures.

It is quite clear, from the resolutions passed by the city from 1837, acting through the common council and subordinate officers, that a distinction was made and maintained between public and private wharves; that during this entire period the public authorities assumed that they had the power to compel and regulate the repair of private docks; and that the proceedings taken, so far as they related to Central wharf, were in pursuance of that power, rather than assuming to manage and operate public docks. The failure to make provisions for wharfage charges, excepting at the foot of the various streets, is a significant fact, as such charges are an incident of public wharves.

It is unnecessary to pursue this subject further, as it is manifest, if the plaintiff did not acquire an easement in this row of docks as a public highway or street, it did not, by the same acts and proceedings taken, acquire any right thereto as a public wharf. The continuous use of the wharf by the owners for private purposes is fatal to any claim that they ever became a public wharf by dedication and acceptance.

The situation between Main and Washington streets is quite different. As has already been observed, it was clearly the intention of the Holland Land Company to lay out and dedicate a highway for the convenience of public travel, beginning at the intersection of Willink's avenue with Big Buffalo creek, and following the northern margin of said creek in its several meanderings as far east as South street. Such a highway, called "Water Street," was laid out and designated upon the map caused to be made and filed by the Holland Land Company in or about the year 1805, to which reference has before been made. That the filing of this map constituted an expressed and formal dedication of the street, highway, and public places thereon laid out, including Water street, there can be no doubt. No particular form is required to the validity of a dedication. It is purely a question of intention, and when the owner of a tract of land makes a map or plan of the same, which shows certain lots, with streets, avenues, and public squares contiguous, and sells accordingly, reference being had to said map, it must be presumed that he intends to dedicate those streets, avenues, and public squares to the public. Irwin v. Dixion, 9 How. 32; U. S. v. City of Chicago, 7 How. 185; New Orleans v. U. S., 10 Pet. 718; Cincinnati v. White, 6 Pet. 431; Godfrey v. City of Alton, 12 Ill. 29. It is true that, as between the public and the dedicator, the latter may at any time before acceptance revoke the offer of dedication. It therefore becomes necessary to ascertain at what precise time the acceptance by the public became complete and operative, and whether or not, before such acceptance, the Holland Land Company, either expressly or by implication, exercised this right of revocation. An examination of the documentary evidence discloses that in 1807 William Willink and others conveyed by warranty deed to Vincent Grant part of outer lot No. 78, as shown on the Holland Land Company's map. That map shows the lots easterly from Willink's avenue as adjacent to and abutting on an open space or street running along the margin of Big Buffalo creek, and designated

thereon as Water street.   In 1815 Grant conveyed it to one Grosvenor, describing it as follows:

"Begins in the south bounds of Beaver street and east bounds of Willink's avenue, being the N. W. corner of lot number 78; runs thence S., 76 degrees east, 5 chains; thence, on lot number 77, S., 14 degrees W., ten and sixty hundredths chains, to the north bounds of Water street; thence bounding on Water street N., forty five and a half degrees W., five and ninety one hundredths chains; thence on Willink's avenue N., 14 degrees E., seven and seventy hundredths chains to beginning."

By this latter description said premises were conveyed through numerous mesne conveyances to John W. Clark in 1832.   In every instance reference was made to said map as filed by the Holland Land Company in 1805.   In 1829 William Willink, by quitclaim deed, conveyed to said Clark an undivided three-quarters of the following described premises:

"Beginning in the S. W. corner of lot 78; thence southeast, on the south line of said lot, five and ninety one hundredths chains to the east lot line; thence S., fourteen W., one and seven hundredths chains, to the Big Buffalo creek; thence westerly, along the banks of said creek, five and eighty-eight one hundredths chains, to the east line of Main street; thence N., fourteen degrees E., one and twenty-nine one hundredths chains, to the beginning point."

The premises last above described include a portion of Water street lying immediately east of Main street, and between outer lot No. 78 and the margin of Big Buffalo creek.   This is the first suggestion on the part of the Holland Land Company which might be construed to indicate an intention to exercise their right of revocation.   Whether or not this latter conveyance, in the absence of an acceptance of Water street by the public, was sufficient to constitute a revocation, we are not called upon to determine, for the Holland Land Company, by the making and filing of the map before referred to, dedicated the street and public places laid down thereon to the public for its use and enjoyment, and such dedication was expressly accepted by act of the legislature (chapter 106) passed April 2, 1813.   Requa v. City of Rochester, 45 N. Y. 132.   This act provided that the freeholders and inhabitants qualified to vote for members of assembly, resident within the district of the county of Erie, known and distinguished, on a map made by Joseph Elliott, and on file in the clerk's office of the said county, as the village lots and outer lots of the village of New Amsterdam, shall be a corporation by the name and style of the "Trustees of the Village of Buffalo."   By this act the legislature clearly accepted the streets, avenues, highways, and public places as laid down on said map, including Water street, running easterly from Willink's avenue along the margin of Big Buffalo creek.   Such acceptance is also further evidenced by the numerous references to Water street to be found in the records of the village and city of Buffalo.   Under date of August 18, 1821, in a book of records containing resolutions of the common council relating to the laying out and opening of streets, grading the same, etc., mention is made of Water street, "one chain wide, bounded on the several meanderings of Buffalo creek to the ferry."   This entry, made in the city records, under the direction of the common council,

must be considered an official act in relation to the street in controversy, recognizing its existence as a public street. "An implied acceptance arises in cases where the public authorities have done acts recognizing the existence of the highway, and treating it as one of the public ways of the locality." Elliott, Roads & St. p. 115.

We, then, being of opinion that the open space or streets running easterly from Willink's avenue, and following the meanderings of Big Buffalo creek, as indicated on the Holland Land Company's map, was duly dedicated to and accepted by the public as a street or highway, and we also having reached the conclusion that the right of wharfage is an incorporeal hereditament, and therefore capable of dedication the same as a street, it now becomes essential to ascertain and decide whether or not the dedication of Water street along the margin of Big Buffalo creek carried with it, and as incident thereto, the right of free access to the water for the usual and customary purposes of navigation. We believe it did.

In Barney v. Keokuk, reported in 94 U. S., at page 340, Judge Bradley said:

"A street bordering on the river, as this did, according to the plan of the town adopted by the decree of partition, must be regarded as intended to be used for the purposes of access to the river, and the usual accommodations of navigation in such a connection. This subject is discussed in Haight's Case, 4 Iowa, 199, where the court said: 'One further thought presented by the petitioner should be noticed. It is that if this ground is dedicated to the public, it is as a street only, and that, if his rights are subject to the public uses, they are so subject to the use of it only as a street or highway, and not as a wharf, and that it is named and called a street, and not a wharf. He claims that the object of a street is for passage, for traveling over, and not to land or deposit goods upon. This is taking a very narrow and close view. The streets of a town are fairly subject to many purposes to which a highway in the country would not be. More regard should be paid to the object and purpose than to the name. The ways of a town would be of comparatively little use if the citizens and traders could not deposit their goods in them temporarily, in their transit to the storehouse; and so of other things, and so it is of the wharf. If goods cannot be deposited upon it, in preparation for shipping them, or unladen upon it from boats and vessels, why is a town located near the river, upon land which, in other respects, is inconvenient, and is expensive to grade, to bring into form and order, and to keep in repair, instead of upon an even prairie, requiring no such trouble and outlay?' "

In Godfrey v. City of Alton, 12 Ill. 29, the court says:

"When an easement is granted to the public upon the margin of a navigable stream, the right to use and treat as a landing is undoubted. Having dedicated the banks of the river, thus uniting the two easements, each of which was essential to the full enjoyment of the other, they had no interests in the bed of the stream which they could reserve, to the prejudice of the enjoyment of the public easement over it."

In Holmes v. Railroad, 8 Am. Law Reg. 716 (citing the Godfrey Case, supra, with approval), it was held that the navigable water is a highway, and when, in contact with this, the easement of a street or highway is granted, and the very location of the latter shows that it was designed for the purpose of loading and unloading freight, landing passengers from the water, the dedication of the banks of the water unites the two easements, each of which is essential to

the full enjoyment of the other.   Backus v. Detroit, 49 Mich. 110, 13 N. W. 380.

It is contended, upon the part of the defendant, that when the property along Water street, east from Willink's avenue, was built up, docks were constructed along the margin of Big Buffalo creek by the owners of fronting property; that these docks occupied the entire space between the southerly line of buildings and the water's edge, including the space or street laid out on the Holland Land Company's map, and called "Water Street"; that the docks east of Main street, between Main and Washington streets, were built and maintained by the owners of lots upon which they stood, and used by them for the purposes necessarily incident to the receiving and forwarding of freight; that merchandise was constantly piled and stored on the dock; that the tendency, especially since 1869, has been to the exclusive use of these docks by the owners and occupants thereof, and that they were not used as a public thoroughfare for teams and vehicles.   The evidence of witnesses as to the use and extent of travel on this line of docks by the public is conflicting, but we having already found that the dedication of Water street, as laid out east of Willink's avenue, carried with it the right of wharfage, with free access to the water.   It becomes unimportant at this time to determine the precise extent of user.   Water street, once established as a public highway, does not cease to be such until it has been discontinued by the proper authorities, and mere nonuser by the public, although for more than 20 years, cannot be deemed in law an abandonment.   Driggs v. Phillips, 103 N. Y. 82, 8 N. E. 514.   After Water street had once become a highway in said village, the municipality could not, by any act or omission, give its consent to the abandonment of it, so as to bar the public right to its use and enjoyment.   People v. Maher, 141 N. Y. 335, 36 N. E. 396.

In St. Vincent Female Orphan Asylum v. City of Troy, 76 N. Y. 114, the court says:

"There is another more decisive answer to the plaintiff's claim that it has acquired a right to maintain this encroachment upon the public street by adverse possession.   It seems to be the settled law that the long continuance of such encroachments, although for more than twenty years, cannot destroy the public right, or take away the authority of the public officers to remove and abate them."

Walker v. Caywood, 31 N. Y. 51; Mills v. Hall, 9 Wend. 315; Kittaning Academy v. Brown, 41 Pa. St. 270; Milhau v. Sharp, 27 N. Y. 611.

These views lead to a judgment directing the removal of any encroachments or obstructions placed by the defendant in the territory described in the complaint as a highway between Washington and Main streets, and dismissing the complaint upon the merits so far as relief is sought affecting the premises in question between Main and Commercial streets.   No doubt but that the city has, in addition to its property interests upon the river front, an interest to protect and conserve this harbor from encroachment and appropriation to private uses; but there is no apparent reason why it

should not obtain this right of property, by rendering fair compensation to those who are the successors in title to Central wharf, and who have had the continued possession for nearly a century.

Costs are not awarded to either party as against the other.