[Civ. No. 9192.   Third Dist.   Feb. 5, 1958.]

CLIFFORD FELIX O'CONNOR et al., Appellants, v. RUMIANO BROTHERS COMPANY (a Corporation) et al., Respondents.

John V. Lewis and George Olshausen for Appellants.

Ware & Kutz for Respondents.

. VAN DYKE, P. J.—This is an appeal from a judgment in favor of defendants and cross-complainants in a quiet title action. The parties own land through which the Sacramento River flows. Appellants brought the action to quiet title to land lying east of the present bank of the river. Respondents claimed title up to the bank. The trial court upheld the claims of respondents and this appeal followed.

Appellants deraigned title from (1) a patent from the United States to the Central Pacific Railroad, dated March 17, 1875, and (2) a patent from the State of California to Jacob Dungan, dated August 29, 1877. The descriptions in these patents refer to lots shown on the government survey. The surveys show a meander line along the west bank of the river with courses and distances given. The chain of title shows that appellants' predecessors described the property in their various conveyances by reference to the same surveys until July 23, 1903, when a deed from Foster to Foster Company described the land according to a recorded subdivision map of Maywood Colony Number 23. Thereafter, conveyances referred to this map until August 15, 1906, on which date an amended map was filed. Thereafter, conveyances in appellants' chain of title referred to the amended map.

Respondents' chain of title originated in a patent from the United States under date of December 3, 1858. By this patent a previous Mexican grant was confirmed. The lands were referred to as lying along the Sacramento River on the east bank thereof, and as being bounded on the west by the Sacramento River. The point of beginning is described as being "A.G.T. No. 14 on the bank of the Sacramento River," and the description continues, "thence up the left bank of the Sacramento River with the meanders thereof." It appears that in this area the river has constantly changed its course so that it now is not located as it was when the government

surveys were made. The movement in the area involved herein has been to the west, so that land formerly west of the river is now east of the river. The land thus added to the area east of the river is claimed by respondents under the doctrine of accretion. Appellants claim that the doctrine is not applicable and that their easterly boundary has not been affected by the changes in the river. They also claim that their title to the land east of the present course of the river was quieted in them against the predecessors of respondents and that their claims to the disputed area are therefore res judicata.

The trial court found that respondents' property had, at all times since the original patent, been bounded on the west by the east or left bank of the Sacramento River and that appellants' property had at all times been bounded by the river on the east; that the river flows between the lands of the respective parties; that over the years from the time the lands left the public domain, the course of the river had gradually and by imperceptible degrees variously and continuously altered and changed; that during that period there had been erosion and accretion from natural causes from the action of the river at various points along its banks affecting the lands of the parties; that the lands in dispute left by the river in its westerly movement had been formed by accumulation and accretion along the east bank of the river; that the lands added to the lands of respondent as the river moved toward the west had been in the exclusive possession and control of respondents and their predecessors in interest.

Appellants contend that the original government patents did not grant the right to future accretion to respondents' predecessors; and that, assuming the right to future accretions was granted, the proof failed to show that the change in the course of the Sacramento River was such that the land left behind on the eastern bank constituted accretion. Appellants say that the burden of proving that the change was by accretion rather than through a shift of the waters themselves without changes in land conformation was not borne by respondents upon whom the burden of proof rested. The points require a summary recital of the testimony, but we will first consider the nature of the patents as granting or as withholding rights to accretion.

The original patents granting the subject lands on the west of the river to the predecessors of the appellants, as well as the original patent issued to the predecessors of respondents,

contained references to the river as being the boundary of the lands conveyed and also contained meander courses along the banks of the stream. The questions presented by such government grants have often received the attention of the Supreme Court of the United States. The test by which to determine whether the grant stops at the meander line or goes to the water, which test has long been adhered to, is stated in *St. Paul & Pac. R. Co.* v. *Schurmeier,* 7 Wall. (U.S.) 272 [19 L.Ed. 74], at page 78 [19 L.Ed.] Said the court:

"Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as a means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser.

"In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows, to a demonstration, that the water-course, and not the meander line, as actually run on the land, is the boundary.

". . . [T]he better opinion is, that proprietors of lands bordering on navigable rivers, under the titles derived from the United States, hold only to the stream, as the express provision is, that all such rivers shall be deemed to be and remain public highways. Grants of land bounded on rivers above tide water, says Chancellor Kent, carry the exclusive right and title of the grantee to the center of the stream, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the river, and the public, in cases where the river is navigable for boats and rafts, have an easement therein, or a right of passage, subject to the jus publicum, as a public highway. . . .

"The views of that commentator are, that it would require an express exception in the grant, or some clear and unequivocal declaration, or certain and immemorial usage, to limit the title of the riparian owner to the edge of the river, because, as the commentator insists, the stream, when used in a grant as a boundary, is used as an entirety to the center of it, and he, consequently, holds that the fee passes to that extent. Decided cases of the highest authority affirm that doctrine, and it must, doubtless, be deemed correct in most or all jurisdictions where the rules of the common law prevail, as understood in the parent country. Except in one or two States, those rules have been adopted in this country, as applied to rivers not navigable, when named in a grant or deed as a boundary

to land. Substantially the same rules are adopted by Congress as applied to streams not navigable; but many Acts of Congress have provided that all navigable rivers or streams in the Territory of the United States offered for sale, should be deemed to be, and remain public highways. . . .

. . . . . . . . . .

". . . [T]he court decides to place the decision, in this case, upon the several Acts of Congress, making provision for the survey and sale of the public lands bordering on public navigable rivers, and the legal construction of the patents issued under such official surveys. Such a reservation, in the Acts of Congress, providing for the survey and the sale of such lands, must have the same effect as it would be entitled to receive if it were incorporated into the patent, especially as there is nothing in the field notes, nor in the official plat or patent inconsistent with that explicit reservation. Rivers were not regarded as navigable in the common law sense, unless the waters were affected by the ebb and flow of the tide, but it is quite clear that Congress did not employ the words 'navigable' and 'not navigable' in that sense, as usually understood in legal decisions. On the contrary it is obvious that the words were employed without respect to the ebb and flow of the tide, as they were applied to territory situated far above tide-waters, and in which there were no salt water streams.

"Viewed in the light of these considerations, the court does not hesitate to decide, that Congress, in making a distinction between streams navigable and those not navigable, intended to provide that the common law rules of riparian ownership should apply to lands bordering on the latter, but that the title to lands bordering on navigable streams should stop at the stream, and that all such streams should be deemed to be, and remain public highways."

In *Hardin* v. *Jordan*, 140 U.S. 371 [11 S.Ct. 808, 838, 35 L.Ed. 428, 433], the court said:

". . . It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines. It has frequently been held, both by the federal

and state courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered; and that the waters themselves constitute the real boundary.''

We are convinced by the foregoing authorities and in view of the form of the governmental grants here involved that on both sides of the river, which is a navigable stream where it passes between the lands of respondents and appellants, the meander lines do not constitute the boundaries of the lands granted, but, on the contrary, that the banks of the river constitute the true boundaries. Therefore, the law of accretion expressed in Civil Code, section 1014, applies, provided, of course, that as found by the court, the accumulation of material on the eastern bank constituted alluvion as required by that section. The section reads as follows:

"Where, from natural causes, land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank.''

The record supports the trial court's finding that the land along the river's former easterly bank, which is the subject of this controversy, was deposited under such circumstances as to cast the title thereto in the owners of the east bank, that is, in the respondents. The various maps and aerial photographs, the language of the conveyances and the chains of title indicate that the banks of the river have undergone constant, gradual and imperceptible changes over the years, involving erosion and accretion. There was testimonial evidence to the same effect. One witness testified from long observation of the river that in the area involved the river changed its course constantly and slowly from side to side and in various ways as the result of erosion and accretion. Appellant Clifford O'Connor stated that the changes in the river's banks took place over the years. A Mr. Stanley, who was in charge of the United States Army survey party which obtained the data for a governmental map, testified from personal knowledge and observation of the river from 1917 to 1933 that it was subject to gradual and constant changes of its course. Another witness testified to the same during the period 1935 to 1952, although he said that there were no noticeable changes in the river, that is to say, no big changes during that period. Another witness, describing the changes in the river between 1908 and 1915 and between 1926 and 1933,

testified that there were no sudden changes in the bank of the river in the area involved. The evidence was ample to support the trial court's finding that the additions to the land along the eastern bank added by change in the course of the river had been brought about factually in such a manner as to require the application of Civil Code, section 1014. Unless, therefore, the title of the respondents was in a sense divested by the decree of the court above referred to, made in a former quiet title action, the judgment of the trial court that the respondents own the land in controversy must be affirmed.

█ During the earlier 1900's, as heretofore stated, the land to the west of the river was, by the predecessors in interest of appellants, subdivided and two subdivision maps thereof were filed of record. Thereafter, transfers were made in accordance with these maps and by references thereto. Although the maps contained a meander line along what purported to be the west bank of the river, nevertheless, the courses and distances called for in the maps were such that if the grid of those maps be superimposed upon the government survey of the land in controversy, the result is that there is a very material overlapping and the overlap includes the land here in controversy. Such were the circumstances when again using the descriptions contained in the subdivision maps appellants' predecessors in interest brought an all persons suit to quiet title. The subdivision map descriptions were used in the complaint and summons. The prayer of the complaint was that the title of the plaintiffs in that action be quieted as to all lands within the descriptions used. Notwithstanding the fact that the land to the east of the river had been in private ownership, as before related, since 1858, the quiet title action did not name parties living on and possessing and using land on the easterly shore of the river. No service of process was made upon them and such efficacy as the decree has must rest upon the theory that they were sued and served as persons unknown claiming some right, title, or interest in the land embraced within the descriptions used in the complaint. █ A quiet title action against unknown defendants does not affect persons known to plaintiffs to claim an interest in the land described. Such persons will not be regarded as unknown persons if they are in actual and open possession of the property embraced within the action and hold record title thereto. (Code Civ. Proc., § 749; *Manuel v. Kiser*, 94 Cal.App.2d 540 [210 P.2d 918].) Said the court in that case at page 545:

"The question thus narrows down to the more precise one of whether a decree entered in an action brought pursuant to section 749 of the Code of Civil Procedure against 'unknown defendants' based upon publication of summons directed to such defendants is binding upon a person claiming an interest in the land and as to whom the plaintiff has actual knowledge.

"By the provisions of section 749 of the Code of Civil Procedure a defendant known to the plaintiff must be served in the manner set forth in sections 405-418 thereof which sections in general require personal service subject to certain exceptions not applicable herein. Thus it would follow that Manuel was entitled to personal service by the very terms of the foregoing sections and such a conclusion is in accord with the general rule that a party in the actual possession of real property cannot be regarded as an 'unknown' person so as to be bound by a decree based upon published service. (146 A.L.R. 713; 128 A.L.R. 114.)''

But appellants contend that the evidence herein was not sufficient to support a finding by the trial court, express or implied, that plaintiffs in the quiet title action could not sue respondents' predecessors in interest as unknown persons and bind them by the decree based on publication of summons. We do not agree. The suit was brought in 1919. There was testimony by witnesses having personal knowledge concerning the use and occupation of the disputed lands by the predecessors in interest of respondents, as follows: The disputed lands consisted of a low-lying gravel and sand deposit, a good deal of it bare along the water's edge, then came an area on which grasses grew suitable for pasture for livestock, then an area covered by brush and trees. Long before the suit was brought the property on the east was owned by Stanford University, and one witness, who had helped to care for the cattle raised upon the property by the university, testified that every season during the spring months the university's cattle, consisting of around 150 head of Holstein cows were regularly pastured over the entire area. The cattle found good feed along the area just beyond the trees and bushes and in decreasing amounts on toward the river and watered in the river. The land was regularly devoted to that seasonal use. There were other witnesses to the same effect and it is apparent from the testimony, without quoting further, that this seasonal use was open, obvious and continuous. From this testimony the court could infer that a continuous use of the land insofar as permitted by its character was made

throughout the years from a period long before the suit was brought down to the present time. Appellants seek to escape the effect of the evidence of use by stating that there is a gap of seven years in the testimony. The point is without merit. The evidence we have referred to was sufficient grounds for an inference by the trial court that notwithstanding there may have been gaps in the testimonial proof of use, yet, from the fact that so much time was covered by the testimony, the use could be held to have continued and to have been existing and to have been plainly observable by appellants' predecessors in interest when they brought their suit. There was a complete absence of any testimony that appellants or their predecessors in interest had ever made any use of the land lying to the east of the river. It could hardly be supposed that the people using lands on the west would not have been aware of the use by those to the east of the land on that side of the river down to the water's edge. We conclude that the court was fully justified in finding that respondents and their predecessors in interest were not bound by the quiet title decree insofar as it applied to the lands here in controversy.

The judgment appealed from is affirmed.

Peek, J., and Warne, J. pro tem.,* concurred.

A petition for a rehearing was denied February 27, 1958, and appellants' petition for a hearing by the Supreme Court was denied April 2, 1958. Carter, J., was of the opinion that the petition should be granted.

---

*Assigned by Chairman of Judicial Council.