**AMOCO OIL COMPANY, Plaintiff and Appellee,**

v.

**STATE HIGHWAY DEPARTMENT of the State of North Dakota, Defendant and Appellant.**

**Civ. No. 9396.**

Supreme Court of North Dakota.

Feb. 16, 1978.

Peter Pantaleo, Sp. Asst. Atty. Gen., State Highway Department, Bismarck, for defendant and appellant.

Pringle & Herigstad, Minot, for plaintiff and appellee; argued by Herbert L. Meschke, Minot.

ERICKSTAD, Chief Justice.

In this case, the State Highway Department of the State of North Dakota, hereinafter known as the State, desirous of obtaining certain lots owned by Amoco Oil Company, hereinafter known as Amoco, which were adjacent to the Mouse River in the City of Minot, made an offer to purchase those lots. In conjunction with the offer, it deposited $73,000 with the Clerk of the Ward County District Court. Amoco, believing the amount insufficient, appealed to the district court where it waived a jury. After due hearing, the district court awarded Amoco an additional $53,300 together with interest, costs, disbursements, and attorneys' fees. Included in this judgment was the sum of $23,300 for Amoco's interest in the river bed in conjunction with its lots.

Prior to the State's taking of this property by eminent domain, the Mouse River was diverted by the Corps of Engineers and thereafter filled by the Corps of Engineers, so that at the time of the trial, the river was no longer in existence in this area.

The issues are: (1) whether or not Amoco owned the land which was created by the diversion of the Mouse River, and (2) if it owned the property, whether or not the district court had before it sufficient evidence upon which to base a finding that the riverfill property had a value of $23,300.

The property which was condemned was described as follows:

"Lots 3, 4, and 5 of Section 14, Township 155 North, of Range 83 West, described as follows: Beginning on a line bet. secs. 13 and 14 in said Twp. and Range at a point one hundred eighty-three (183) ft. N. from the SE Cor. of said sec. 14 and running thence north along the sec. line one hundred and twenty-five (125) ft., *thence west at right angle to said sec. line 133 ft. to the left bank of the Mouse River thence down stream along said left bank to a point eighty-six (86) ft. west from the point of beginning,* thence east and parallel with the north bdry. of tract 86 ft. to the point of beginning and containing three tenths (.3) of an acre, more or less and divided into lots 3, 4 and 5 as shown on plat. Lot 3 having 30 ft. frontage, lot 4 having 33 ft. frontage, and lot 5 having 62 ft. frontage. The E. and W. line i. e. the N. and S. bdry. lines of the several lots are parallel lines.

"Beginning at the SECTION CORNER common to SECTIONS 13, 14, 23 and 24, TOWNSHIP 155 NORTH of RANGE 83 WEST; thence running NORTH along the SECTION LINE between SECTIONS 13 and 14 of the said Township and range, a distance of one hundred eighty-three feet (183) to a point, *thence running WEST at right angles to the last described line, a distance of eighty-six feet (86) to the east bank of the MOUSE RIVER; thence meandering SOUTHERLY along the said EAST BANK of the MOUSE RIVER to a point on the section line between SECTIONS 14 and 23 of the above described township and range*; thence running EAST along the section line between the said SECTIONS 14 and 23, a distance of one hundred three and five tenths feet (103.5) to the above described SECTION CORNER common to SECTIONS 13, 14, 23, and 24 the place of beginning of described land, has caused the same to be surveyed and platted and hereafter known as 'PLAT of OUTLOT

NUMBER 9 of the SOUTHEAST ¼ of SECTION 14, TOWNSHIP 155 NORTH, of RANGE 83 WEST of the CITY of MINOT, WARD COUNTY, NORTH DAKOTA', and hereby donates and dedicates to the public use forever all streets and avenues hereby shown." (Emphasis added.)

The State asserts that an owner of property bordered by a nonnavigable stream owns to the middle of the stream unless an intent to the contrary is manifested. It contends that in this instance an intent to the contrary is manifested by reference in the descriptions of the property to the term "bank". It argues that, had the reference merely been to the "river" rather than to the "bank", the land under the river to the middle of the stream would have been the property of the adjacent landowner, in this case Amoco; but as the word "bank" was used, that an intent to restrict the conveyance to the land not covered by the water was clearly intended.

The pertinent statute in this case reads:
"Except when the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on a navigable lake or stream, takes to the edge of the lake or stream at low watermark. All navigable rivers shall remain and be deemed public highways. *In all cases when the opposite banks of any stream not navigable belong to different persons, the stream and the bed thereof shall become common to both.*" (Emphasis added.) § 47–01–15, N.D.C.C.

■ Although our court has apparently never decided whether the word "common" means that two opposite shore owners will own the bed as tenants in common, or whether each shall own a part of the bed, we conclude, now, as the United States Supreme Court has previously concluded in construing similar language of the Federal statute, that each riparian owner owns to the center of a nonnavigable stream, the "center" being synonymous with "thread".[1]

The thread of a stream is defined by one authority as "the line midway between the opposite shore lines when the water is at its ordinary stage and neither swollen by freshets nor shrunken by droughts, no account being taken of main channel, current, or of line of greatest depth." 1 Patton on Titles § 140 (2d ed.).

Both parties to this lawsuit assume that the Mouse River is nonnavigable. In *Bissel v. Olson,* 26 N.D. 60 at 66, 143 N.W. 340 at 341 (1913), this court said:
"1. When a stream claimed to be navigable is not meandered nor declared navigable by the Legislature, it is presumed to be nonnavigable, and the burden is upon the party claiming it to be navigable to show that it is so in fact."

■ As there is no legislative declaration of navigability of the Mouse River, the presumption that it is nonnavigable applies. We will especially apply the presumption here where neither party contends to the contrary.

To support its contention that the use of the term "bank" limited the property, the State relies upon citations including 1 Patton on Titles, § 132 *Water Boundaries—Nonnavigable Rivers and Streams,* p. 345; 6 Powell on Real Property, ¶ 891 *Description—Boundary a monument having width,* pp. 219–221 (1970); *St. P. & P.R.R. Co. v. Schurmeier,* 74 U.S. (7 Wall.) 272, 19 L.Ed. 74 (1868); and *Hutton v. Yolo Orchard Co.,* 203 Cal. 724, 265 P. 933 (1928).

The State quotes extensively from *Allen v. Weber,* 80 Wis. 531, 50 N.W. 514 (1891), as follows:
"In the following cases the line is limited by the description, and no part of the bed of the stream is conveyed: 'Thence northeasterly up the west bank of Pine creek.' *Murphy v. Copeland,* ([51] Iowa [515]) 1 N.W.Rep. 691 [58 Iowa 409], 10 N.W.Rep. 786, and cases cited. 'To and along the bank.' *Halsey v. McCormick,* 13 N.Y.

---

1. *See St. P. & P.R.R. Co. v. Schurmeier,* 74 U.S. (7 Wall.) 272, 287–89, 19 L.Ed. 74 (1868). *See also,* article by Professor Robert E. Beck, *Boundary Litigation and Legislation in North Dakota,* Vol. 41, N.D.L.Rev. 424, 439–441 (May, 1965).

296; *People v. Supervisors,* ([125] Ill.Sup. [9]) 17 N.E.Rep. 147. 'As far as highwater mark' is the outer line of the overflow of a mill-pond so described in the conveyance. *Jones v. Parker,* ([99] N.C. [18]) 5 S.E.Rep. 383. 'To the Genesse river; thence northwardly along the shore of said river.' *Starr v. Child,* supra [20 Wend. 149, 4 Hill 369]. In *Murphy v. Copeland.* supra, it was held that 'along the bank' was equivalent to 'along low-water mark;' and the same in *Halsey v. McCormick,* supra. In *Cook v. McClure,* 58 N.Y. 437, the language is: 'To a stake near the high-water mark of the pond, running thence along the high-water mark of said pond, to,' etc.—and it was held that the line was limited at high-water mark, and would not extend even to low-water mark. This case is exactly in point. In *Bradford v. Cressey,* 45 Me. 9, the language is: 'Thence east until it strikes the creek on which the mill stands; thence south-westerly on the west bank of said creek,'—and it was held that 'the grantee was restricted to the bank of the creek.' " 50 N.W. 514 at 515.

We think it significant to note in *Allen,* that the court, in arriving at its conclusion relative to the meaning of the description which read to "low-water mark", considered other circumstances.

In that respect, the court commented: "If the situation of the strip on the pond is consulted, that would evince the same intention. It was contiguous to a very old mill-dam, belonging to the grantors, now called the 'Fox River' at that point. It was not likely that it was intended to give the grantees of this strip any interest in the waters of the pond, or any control over the water-power, or interference with it. Such a situation of the strip clearly indicates the intention to so limit the eastern line to low-water mark, and not have it extend *ad filum aquae* of the pond." *Allen v. Weber,* supra 50 N.W. at 515.

We think that *Hutton, supra,* is also distinguishable. In *Hutton* the reference in the various deeds was "to the Bank of

Cache Creek". The court concluded that, in addition to the reference to the bank, there were other circumstances in the case which justified the conclusion that the descriptions were intended to be limited to the bank. In that connection, the court said:

"It is to be noted that these several conveyances refer directly or impliedly to the official map of the town of Cacheville. When that ancient map and the several unofficial tracings of which were offered in evidence are examined, it will be seen that in all of these Cache creek is delineated both as to its center and as to its banks and that upon the westerly bank of said creek the lots to which the foregoing conveyances relate are laid out, and that as thus originally laid out they each ran not to the center but to the bank of said stream. It is also to be noted as a most significant coincidence that the descriptions of several of the lots thus conveyed relate and refer to each other in a way which leads to the almost irresistible conclusion that the grantor of these not only had the configuration of the official map itself in mind in their description, but that he also had in mind the idea that these lots were to run back uniformly; and thus the phrasing 'to the bank of Cache creek' is to be given application to each of said lots so conveyed, and is also to be given its natural significance, viz., that the rear boundary of each and all of these lots was to be 'the bank' and not 'the center' of Cache creek." *Hutton v. Yolo Orchard Co., supra* 203 Cal. at 729, 265 P. at 935.

█ It may be that the other cases are likewise distinguishable, but we have not pursued that possibility inasmuch as we believe that the answer to the controversy in this case lies in the last sentence of Section 47–01–15, N.D.C.C. It reads:

"In all cases when the opposite *banks* of any stream not navigable belong to different persons, the stream and the bed thereof shall become common to both." (Emphasis added.)

As that sentence indicates the owners of opposite banks of any nonnavigable stream

own the bed thereof, it would appear to us that the owners of the banks in this case also own the bed of the stream unless something other than the use of the term bank is relied upon to indicate a contrary intention. In the instant case there is nothing other than the reference to the term bank from which to gather a contrary intention. Accordingly, we conclude that the owner of the bank owns the bed of the stream to its thread or center. *See Sheldon v. Sevigny,* 110 N.H. 419, 272 A.2d 134 at 136–137; 78 A.L.R.3d 604 at 615, *Deeds: Description of Land Conveyed by Reference to River or Stream as Carrying to Thread or Center or Only to Bank Thereof—Modern Status.*

We think that our statutory rules of construction, and in particular, Section 1–02–01, N.D.C.C., support this view. That section reads:

> "The rule of the common law that statutes in derogation thereof are to be construed strictly has no application to this code. The code establishes the law of this state respecting the subjects to which it relates, and its provisions and all proceedings under it are to be construed liberally, with a view to effecting its objects and to promoting justice."

As the State was given the opportunity by the trial court to define its taking to avoid the taking of the bed of the stream to its thread, and it declined to do so saying that it intended to take whatever Amoco owned in that area, the issue over whether or not it acquired the riverfill area is resolved by our determination of Amoco's ownership.

■ The second issue is whether or not the district court had before it sufficient evidence upon which to base a finding that the riverfill property had the value of $23,-300.

The State makes two points in conjunction with this issue: (1) the riverfill area has not been surveyed so its exact proportions were never introduced at trial, and (2) there was insufficient evidence as to the quality and the nature of the fill on which to base an opinion of value of the riverfill area. In this connection, we think that the evidence on this issue submitted by Amoco explains and justifies the trial court's finding of damages.

As damages are a question of fact, we are governed by Rule 52(a), N.D.R.Civ.P. The crucial part of Rule 52(a) for our purposes today, is that which reads:

> " . . . Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

In *In Re Estate of Elmer,* 210 N.W.2d 815 at 820 (N.D.1973), we said:

> "A finding is 'clearly erroneous' only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). The mere fact that the appellate court might have viewed the facts differently, if we had been the initial trier of the case, does not entitle us to reverse the lower court."

The evidence as to the extent of the property and the value of the property in the riverfill area was submitted on the part of Amoco through two witnesses, namely, Alvin L. Lidenberg, an Amoco executive, and Stanley Saugstad, an appraiser.

Mr. Lidenberg testified that, when a temporary easement was obtained from Amoco by the Ward County water management district for filling the river, he investigated and measured to the center of the river. He concluded that "a conservative half of the river would make our property 120 feet in depth".

Mr. Saugstad testified that he "estimated that the additional land acquired through this process would be approximately 50 feet in width" and "approximately 11,650 square feet in area." He valued the fill property at $2.00 a square foot for a total of $23,300, whereas he valued the other land at $5.50 per square foot.

Although we recognize that evidence based upon a survey of the fill area and

compaction tests would have been helpful, we are not convinced that without that evidence the trial court was incapable of making a determination of the value of the property involved. As the State elected not to submit any testimony on either the size of the property or compaction, it is not in the strongest position to criticize the evidence that has been submitted, particularly in light of the complexities which are involved in making determinations of that type in this case.

We accordingly conclude that the findings as to the value of the riverfill area are not clearly erroneous.

The judgment of the trial court is, therefore in all things affirmed.

VOGEL, PEDERSON, PAULSON and SAND, JJ., concur.