Mr. Justice CLIFFORD
 

 delivered, the opinion of the court.
 

 Complainant alleged that he was the owner in fee, and in the actual possession of the real estate described in the bill of complaint, together with the stone warehouse thereon erected. As described, the premises are situated in the city of St. Paul, county of Ramsey, and'State of Minnesota; and the allegation is, that the lot extends to, and adjoins the public street and levee which run along the left bank of the .Mississippi River in front of that city; that the said street aiid levee constitute the public landing for all steamboats and other vessels bound to that port, and the place where al] such vessels receive and discharge their freight and passengers; that the street, levee, and public landing, occupy the whole space between this lot and the bank of the river, in front of the same, and that he is the owner in fee of that
 
 *281
 
 whole space, subject to the public right to use and occupy the same as such street, levee, and public landing.
 

 Based upon these preliminary allegations, the charge is, that the corporation respondents were then engaged, without his license or consent, in extending and constructing their railroad over and along the said public street, levee, and landing, in front of his premises, with the design and purpose of running their cars on the same for the transportation of freight and passengers; and the complainant alleged that the effect would be, if the design and purpose of the respondents should be carried out, that the said public street, levee, and landing, could not be occupied and used for the purposes for which they were constructed, and to which they were dedicated, and that his premises would be rendered useless and valueless.
 

 Two defences were set up by the respondents in their answer.
 

 First. They denied that the fee of the land described in the bill of complaint, as a public street'and levee, or public landing, was ever in the complainant, or that he ever had any right, title, or interest in the land between his premises and the main channel of the river.
 

 Secondly. They alleged that all the land between the premises of the complainant and the river in front, were part and parcel of the lands surveyed by the United States, and granted by the act of Congress of the 8d of March, 1857, to the Territory of Minnesota, and that they were the owners of the same in fee, as the grantees, of the Territory and State, to aid in the construction of their railroad.
 

 Defence of the other respondents is, that all the acts charged against them were performed by the direction and under the authority of the respondent corporation.
 

 Prayer of the bill of complaint was, that the respondent might be restrained from extending and constructing their railroad over and along said public street, levee, or landing, and from obstructing and impeding the free, use of the same by the public. .
 

 By consent of parties, it was subsequently ordered by the
 
 *282
 
 court, that the cause be referred to a sole referee, to hear and determine all the issues in the pleadings, and that he should report his determination to the court. Such a report was subsequently made by the referee, and the record shows that the court, in pursuance of the same, enjoined the respondents as prayed' in the bill of complaint, and ordered, adjudged, and decreed that the respondents should remove from the street, levee, and lauding in front of the complain- ' ant’s premises, all tracks, trestleworks, embankments, buildings, and obstructions of every kind erected or constructed thereon by them for railroad purposes.
 

 Appeal was taken by the respondents from the decree, as rendered in the District Court for that county, to the SupiUme Court of the State, where the decree was in all things affirmed* and the respondents removed the cause into this court, by a.writ of error, sued out under.the twenty-fifth section of the Judiciary Act.
 

 1. Express finding of the referee was, that the premises in question were included in that part of section five, township twenty-eight north, in range twenty-two. west of the fourth principal meridian, which is situated on the north side of the
 
 centre
 
 line of the Mississippi River. He also found that the survey of that part of section five was made by the deputy surveyor, October 27, 1847; that the field-notes of the survey were duly communicated to the surveyor-general, and that the latter officer, on the 15th of March following, duly approved the survey as made by the deputy surveyor. Same report also ..shows that a plat of that part of seetion'five was duly prepared and certified by the surveyor-general, on the same day, and that it was duly transmitted to the land office of the district where the land was situated. ’ By that plat it appears that the land, as surveyed, consisted of two separate parcels, called lots 1 and 2, injthe report of the referee, exhibited in the record. Lot 1, the-tract in'question, is situated in the northwest corner of the section,, ¿nd'.contains the quantity of land described' in the'official-survey and plat.- -Particular description of lot 2 is unnecessary; as it is not in controversy in this case.
 

 
 *283
 
 Both of those lots were purchased by Lewis Roberts, and on the 24th of March, 1849, a patent, in due form of law, was issued to him, for the same, by the proper officers of the United States. Possessed of a full title to all the land described in the patent, the purchaser caused lot 1 to be surveyed and laid out into town blocks, lots, streets, &c., as a part of the town of St. Paul, and the finding of the referee is, that the plat, as recorded, describes the land as extending to the main channel of the river. Block 29, as exhibited on that plat, includes lots 11 and 12, described in the bill of complaint, and the report of the referee shows that they are a part of the triaugular fraction of land situated in the northwest corner of section 5, as delineated on the official plat.
 

 Claim of the complainant is to lots 11 and 12, in block 29, and the finding of the referee is, that he holds the sanie through certain mesne conveyances, from the original grantee under the patent.
 

 Congress granted to the Territory of Minnesota, by the act of the 3d of March, 1857, for the purpose of aiding in the construction of certain railroads, every alternate section, designated by odd numbers, for six sections in width, on each side .of the respective railroads therein mentioned, and their branches, and the respondents claim title to the premises described in the pleadings under that act of Congress, as the grantees of the State.
 
 *
 

 Title claimed by the complainant, being of prior date to that set up by the respondents, will be first examined, because, if it be sustained as including the premises in controversy, an examination of the title of the respondents will not be necessary.
 

 Since the town of St. Paul was organized under her city charter, passed March 4, 1854, the city government has exercised municipal authority and control over the entire parcel of land lying between the main, channel of the river and
 
 *284
 
 block twenty-nine, where the complainant’s wai’ehouse is situated. Claiming entire control over the premises, as a street, levee, or landing, the city authorities have established a grade for the same, and, long before any attempt was made by the respondents to controvert the title of the complainant, they had made large progress in the work of reducing the surface of the land to the established grade.
 

 Appellants contend that the river is not a boundary in the official survey; that the tract, as surveyed, did not extend to the river, but that the survey stopped at the 'meander-posts and the described trees on the bank of the river. Accordingly, they insist that lot 1 did not extend to the river, but only to the points where the township and section lines intersect the left bank of the river, as shown by the meander-posts.
 

 The finding of the referee also shows that the meander-line of lot 1 was run, in the official survey, along the left or north bank of á channel which then existed between that bank and a certain parcel of land in front of the same, after-wards designated as Island 11, but which was not mentioned in the field-notes of the official survey, nor delineated on the official plat.
 

 Conceded fact is, that those field-notes constituted the foundation of the official plat,, and that that plat was-the only one in the local laud office at the time the patent was issued under which the appellee claims. When the water 'in the river was at a medium height, there was a current in the channel, between what is called the island and the bank’, where' the meander-posts were located, but when the water was low, there was no current in that channel, and, when the water was very high in the river, the entire parcel of land, designated as the island, was completely inundated.
 

 No mention is made of any such channel in the official survey, under which the patent was issued; but the deputy-surveyor, under the instructions of the land office, on~the 18th of March, 1856, made a new survey of the parcel of land lying between that channel and the main channel of the river, and the field-notes of the same were subsequently
 
 *285
 
 approved by the surveyor-general. Duplicates of that survey were communicated to the General Land Office, and the finding of the referee shows that the plat exhibits the true relation which that tract bears to lot 1 in that section. Prior to that survey, however, the city of St. Paul had filled the channel, and reclaimed the land at the west end of the same, and extended the grade of the street and levee, or landing, entirely across the island to the main channel of- the river. Besides, the' uncontradicted fact is, that the landing for boats and vessels, touching at that port, was always on the riverside of the island, and the finding of the referee shows that the. front wall of the complainant’s warehouse is not more than four feet north of the southerly line of the lot on which it is erected.
 

 Surveyors were- directed by the act of Congress of the 20th of May, 1785, to divide the territory, ceded by individual States, into townships of six miles square, by lines running due north and south, and others crossing these at right angles, .... “unless where the boundaries of the tracts purchased from the Indians rendered the same impracticable.”
 
 *
 

 Congress preserved the samé system also in the act of the 18th of May, 1796, in respect to the survey and sale of the' lands northwest of the Ohio River, but the latter act recognizes two other necessary exceptions to the general rule.
 
 †
 
 Public lands therein described were required to be divided' by north and south lines running according to the true meridian, and others crossing them by right angles, so as to form townships of six miles square, “ unless where the line of the late Indian purchase, or of the tracts of land heretofore surveyed or patented, or the course of navigable rivers, may render it impracticable.” By the ninth section of that act, it is provided that all navigable rivers within the territory mentioned in that act, should be deemeffito be, and remain, public highways, and that, in all cases where the opposite banks of any stream, not navigable, shall belong to different
 
 *286
 
 persons, the stream and the bed thereof should become common to both.
 
 *
 

 Provision was made by the'act of February 11, 1805, that townships should be “subdivided into sections, by running straight lines from the mile corners, marked as therein required, to the opposite corresponding corners, and by marking on each of the said lines intermediate corners, as nearly as possible equidistant from the corners of the sections on the same.” Corners thus marked in the surveys, are to be regarded as the proper corners of sections, and the provision is, that the corners of half and quarter sections, not actually run and marked on the surveys, shall be placed, as nearly as possible, equidistant from the two corners standing on the same line.
 
 †
 
 Boundary lines actually run and marked on the surveys returned, are made the proper boundary lines of the sections or subdivisions for which they .were intended, and the second article of the second section provides, that the length of such lines, as returned, shall be held and considered as the true length thereof. Lines intended as boundaries, but which were not actually run aud marked, must be ascertained by running straight lines from the established corners to the opposite corresponding corners; but where no such opposite corresponding corners have been, or can be fixed, the boundary lines are required to be ascertained by running from the established corners due north and south, or east and west, as the case may be, to the water-course, Indian boundary line, or other external boundary of such fractional township.
 

 Express decision of the Supreme Court of the State was, that the river, in this case, and not the meander-line, is the west boundary of the lot, and in that conclusion of the State court we entirely concur.
 
 ‡
 

 Meander-lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the
 
 *287
 
 sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser.
 

 In preparing the official plat from the field-notes, the meander-line is represented as the border-line of the stream, and shows, to a demonstration, that the water-course, and not the meander-line, as actually run on the land, is the boundary.
 

 Proprietors, bordering on streams not navigable, unless restricted by the terms of their grant, hold to the. centre of the stream; but the better opinion is, that proprietors of lands bordering on navigable rivers, under titles' derived from the United States, hold only to the stream, as the express provision is, that all such rivers shall be deemed to be, and remain public highways. Grants of land bounded on rivers above tide-water, says Chancellor Kent, cany the exclusive right and title of the grantee to the centre of the stream, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the river, and the public, in cases whore the river is navigable for boats and rafts, have an easement therein, or a right of passage, subject to the
 
 jus publicuh:,
 
 as a public highway.
 
 *
 

 The views of that commentator are, that it would require an express exception in the grant, or some clear and unequivocal declaration, or certain and immemorial usage, to limit the title of the ripai’ian owner to the edge of the river, because, as the commentator insists, the stream, when used in a grant as a boundary, is used as an entirety to the centre of it, and he consequently holds that the fee passes to that extent. Decided cases of the highest authority, affirm that doctrine, and it must, doubtless, be deemed correct in most or all jurisdictions where the rules of the common law prevail, as understood in the parent country. Except in one or two States, those rules have been adopted in this country, as applied to rivers not navigable, when named in a grant or deed as a boundary to land. Substantially the same rules
 
 *288
 
 are adopted by Congress as applied to streams not navigable; but many acts of Congress have pi-ovided that all navigable rivers or streams in the territory of the United States, offered for sale, should be deemed to be, and remain public highways.
 
 *
 

 Irrespective of the acts of Congress, it should be remarked, that navigable waters, not affected by the ebb and flow of the tide, such as the great lakes, and the Mississippi River, were unknown to courts and-jurists, when the rules of the common law were ordained; and even when the learned commentaries were written, to which reference is made, it w.as still* the settled doctrine of this court, that the admiralty had no jurisdiction except where the tide ebbed and flowed.
 
 †
 

 Extended discussion of that topic, however, is unnecessary, as the court decides to place the decision, in this case, upon the several acts of Congress making provision for the survey and sale of the public lands bordering on public navigable l'ivers, and the legal construction of the patents issued under such official surveys. Such a reservation, in the acts of Congress, providing for the survey and sale of such lands, must have the same effect as it would be entitled to receive if it were incorporated into the patent, especially as there is nothing in the field-notes, or in the official plat or patent, inconsistent with that explicit reservation. Rivers were not regarded'as navigable in the common law sense, unless the waters were affected by the ebb and flow of the tide, but it is quite clear that Congress did not employ the words navigable, and not navigable,.in that sense, as usually understood in legal decisions. On the contrary, it is obvious that the words were employed without respect to the ebb and flow of the tide, as they were applied to territory situated far above tide-waters, and in which there were no salt-water streams.
 

 Viewed in the light of these considerations, the court does not hesitate to decide, that Congress, in making a distinction
 
 *289
 
 between streams navigable and those not navigable, intended to provide that the common law rules of riparian ownership should apply to lands bordering on the latter, but that the title to lands bordering on navigable streams should stop at the stream, and that all such streams should, be deemed to be, and remain public highways.
 

 Although such riparian proprietors are limited to the stream, still they also have the same right to construct suitable landings and wharves, for the convenience of commerce and navigation, as is accorded riparian proprietors bordering on navigable waters affected by the ebb and flow of the tide.
 
 *
 

 Argument' is scarcely necessary to show, in view of the definite regulations of Congress upon the subject 'of the survey and sale of the public lands, that the second survey of the space between block twenty-nine and the main channel of the river, cannot affect the title of the complainant as acquired from the United States under the antecedent official survey and sale.
 
 †
 

 Attempt is also made to justify the acts of the respondents, as grantees of the State, upon the ground, that the complainant, in dedicating the premises to the public as a street, levee, and landing,, parted with all his title to the same, and that the entire title vested in fee in the State. Respondents rely for that purpose upon the statute of the Territory of 'Wisconsin, which was then in force in the Territory of Minnesota.
 
 ‡
 

 Suppose the construction of that provision, as assumed by the respondents, is correct, it is no defence to the suit, because it is nevertheless true, that the municipal corporation took the title in trust, impliedly, if not expressly, designated by the acts of the party in making the dedication. They could not, nor could the. State, convey to the respondents any right to disregard the trust, or to appropriate the prem
 
 *290
 
 ises to any purpose which would render valueless the adjoining real estate of the complainant.
 

 Considered in any point of view, our conclusion is, that the decree of the State court was correct; and the decision in this ease also disposes of the appeal brought here by the same appellants, from a decree rendered by the Circuit Court of the United States for the District of Minnesota, in favor of George D. Humphreys and others, which was a bill in equity against the same respondent corporation. The appeal in that case depends substantially upon the same facts, and must be disposed of in the same way. Both decrees are
 

 Affirmed.
 

 *
 

 11 Stat. at Large, 195; State Session Laws, 1857, 70; Gen. Laws, 1858, 9; Session Laws, 1862, 226.
 

 *
 

 1 Land Laws, 19.
 

 †
 

 1 Stat. at Large, 464.
 

 *
 

 1 Stat. at Large, 468.
 

 †
 

 2 Id. 313.
 

 ‡
 

 Schurmeier v. The Railroad, 10 Minnesota, 82.
 

 *
 

 3 Commentaries, 11th ed. 427.
 

 *
 

 1 Stat. at Large, 491; 2 Id. 235, 279, 642, 666, 703, 747; 3 Id. 349.
 

 †
 

 The Jefferson, 10 Wheaton, 428; Genesee Chief, 12 Howard, 456 ; Hine
 
 v.
 
 Trevor, 4 Wallace, 565.
 

 *
 

 Dutton
 
 v.
 
 Strong, 1 Black, 23.
 

 †
 

 Lindsey
 
 v.
 
 Hawes, 2 Black, 554; Bates
 
 v.
 
 Railroad Company, 1 Id. 204; Brown v. Clements, 3 Howard, 650.
 

 ‡
 

 Statutes of Wisconsin Territory 159.