**UNITED STATES v. BOYNTON et al.**
No. 6596.

Circuit Court of Appeals, Ninth Circuit.
Nov. 2, 1931.
Rehearing Denied Dec. 7, 1931.

Anthony Savage, U. S. Atty., and Hamlet P. Dodd, Asst. U. S. Atty., both of Seattle, Wash.

Baldrey & Kenyon, Loomis Baldrey, and E. D. Kenyon, all of Bellingham, Wash., for appellees.

Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.

JAMES, District Judge.

By this appeal, taken by the United States from a decree of the District Court, the question is presented as to whether, in making allotments of land in the Lummi Indian Reservation in the State of Washington, the line of the government survey along the shores of Bellingham Bay on the one side and Hale's Passage on the other, where meanders were shown by the surveyor, became a line of definite location.

In 1873, pursuant to the treaty made with the Indian tribes, the President of the United States by proclamation established the Lummi Indian Reservation and caused a survey to be made for the purpose of dividing the land into suitable parcels that it might be allotted to individual members of the tribe. This survey was made by John M. Snow. Under instructions from the Surveyor General, a second plat was made in 1883, which was duly filed and recorded. This appears to be a substantial duplication of the plat of the Snow survey. The parcels of land were indicated as being composed of a stated acreage, and each lot was given a number. Lot 1 is a triangular shaped parcel at the southern end of the reservation, its lower extremity becoming a narrow strip. It is bounded on the east by the shore line of Bellingham Bay and on the west by Hale's Passage. The government brought this suit to quiet title for the benefit of the Indians of the reservation, to the tidelands abutting this parcel of land.

Lot 1 in 1884 was assigned to Tsumilano, a tribe member, and a patent was issued to him. In 1928 Tsumilano died, and his heirs, with the approval of the Department of the Interior, sold the land to appellees. Since the making of the Snow survey and the replatting of 1883, the sea has, as the trial judge determined in his findings, at some points eroded the shore line of lot 1, and at other points there have been accretions.

The President's proclamation establishing the reservation extended the lines to low water. It was conceded by appellees that the surveys under which the allotments were made were intended to carry the line along the sea to high-tide mark only. In the answer filed to plaintiff's (appellant's) bill of complaint, this statement appears: "That said defendant asserts no claim to any tide lands adjoining to or abutting upon said Lot 1 as shown by said survey and map"—meaning the tideland as it existed at the time the survey was made. The United States has insisted that the survey as made, and under which the allotment was received by Tsumilano, where the lines are shown by field notes to be above or below high-water mark, indicate no definite or fixed lines along the shores of Bellingham Bay and Hale's Passage; that they are meander lines merely, used to designate generally, in blocking out the land, the high-water mark, which lines might shift and change from time to time.

The field notes of Snow showed that the lines run by him along the shores were "meander" lines. Distances were recorded in the field notes between meander points it is true,

**298**

and certain monuments, such as trees, were referred to, as were posts which the surveyor planted. The district judge heard the testimony of a number of witnesses, several of them being aged Indians who had lived on the reservation all their lives. One Indian testified that he had acted as chainman for Snow, and he testified that when Snow ran his meander lines he was upon the high ground—presumably above the high-water mark. The trial judge found that the meander lines of Snow were fixed and definite; that they "did truly portray the high water line in 1873 and 1883"; and that the boundaries of lot 1 along the shore lines could not be varied or changed thereafter by the action of the sea or tides. He found that when the patent was issued to Tsumilano by the United States, that patent extinguished the government's ownership and the title of the Lummi Indian Tribe "to all the lands of said Lot 1, included within the boundary lines of said Snow's survey made in 1873."

 While keeping in mind that the proclamation setting aside the tract of land as an Indian Reservation extended the lines to low-water mark, it is to be remembered that the appellees here made no contention that the allotments were to include any land below high-water mark as that mark existed at the date of survey; this being consistent, thus far, with the government's contention that the purpose when the allotments were made was to reserve for the common use of the tribe the land over which the tides flowed. Thus, the question we have to determine is whether Snow, in indicating a high-tide line, definitely fixed a shore line survey. Meander lines, as used in land surveys, where they indicate a course along navigable waters, refer to the line as the water itself may delineate it, subject to changes that different tides or water flows may work. St. Paul & P. R. Co. v. Schurmeier, 7 Wall. (74 U. S.) 272, 19 L. Ed. 74; Hardin v. Jordan, 140 U. S. 371, 11 S. Ct. 808, 838, 35 L. Ed. 428; Taylor v. United States (C. C. A.) 44 F.(2d) 531. Because a meander line, as carried into field notes, shows corners, posts, monuments, and courses, does not result in the line so delineated becoming definite and fixed. Some action must have been taken, or words used in the instrument of conveyance, which will show that the grantor has agreed that such line shall be considered as having more than its assigned character; it must be agreed that it indicates a definite boundary limit.

In Jefferis v. East Omaha Land Co., 134 U. S. 178, 10 S. Ct. 518, 520, 33 L. Ed. 872, meander lines of the survey of land along the Missouri river were described with as much definiteness in the field notes as were the meander lines of Snow. The existing water line was there held to be the boundary, notwithstanding the meander description, and the court said: "Where a water line is the boundary of a given lot, that line, no matter how it shifts, remains the boundary; and a deed describing the lot by number or name conveys the land up to such shifting water line, exactly as it does up to the fixed side lines; so that, as long as the doctrine of accretion applies, the water line, no matter how much it may shift, if named as the boundary, continues to be the boundary, and a deed of the lot carries all the land up to the water line." The court further, quoting from an earlier case, New Orleans v. U. S., 10 Pet. 662, 9 L. Ed. 573, continued: "The question is well settled at common law, that the person whose land is bounded by a stream of water which changes its course gradually, by alluvial formations, shall still hold by the same boundary, including the accumulated soil. No other rule can be applied, on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory; and, as he is without remedy for his loss in this way, he cannot be held accountable for his gain."

United States v. Romaine et al. (C. C. A.) 255 F. 253, concerned questions affecting the grant of this same reservation, and the court referred to the map of Snow; but nothing that is said therein directly meets the question here considered.

 In our opinion the court erred in determining that the meander lines of Snow had been adopted by the government as fixed and definite boundaries of lot 1 along the sea. The high-tide line as now located, in our opinion, defines the limits of the property owned by appellees.

The decree is reversed.