No. 04-583

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 310

WILLIAM R. ANDERSEN,

        Plaintiff and Respondent,

   v.

REMI E. MONFORTON; McCOLLUM, LLC; JEFFERSON
RIVER RANCHES, LLC; and JEFFERSON RIVER
RANCHES HOMEOWNERS' ASSOCIATION, INC.,

        Defendants and Appellants.

APPEAL FROM:    The District Court of the Fifth Judicial District,
In and For the County of Madison, Cause No. DV 29-2001-34,
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

        Jack H. Morris, Jardine & Morris, Whitehall, Montana

        For Respondent:

        Robert K. Baldwin, Goetz, Gallik & Baldwin, Bozeman, Montana

Submitted on Briefs:  September 29, 2005

Decided:  December 9, 2005

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    Appellants appeal from the grant of summary judgment to William Andersen. We affirm.

¶2    We address the following issues on appeal:

¶3    1. Whether Andersen's deed indicates that he does not own the land adjacent to his property between the high-water and low-water lines.

¶4    2. Whether Andersen is bound by the prior quiet title decree adjudicating McCollum, LLC, as the owner of the disputed property.

¶5    3. Whether certain portions of Appellant's Reply Brief should be stricken.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6    Respondent William Andersen and Appellants Doug and Valerie McCollum are neighbors. Appellants McCollum, LLC, Jefferson River Ranches, LLC, and Jefferson River Ranches Homeowners' Association, Inc., are all entities established by the McCollum family. This appeal arises from a dispute over who owns an 11.14 acre tract of land to the north of Andersen's property that sits between the high-water line (the bank of the Jefferson River) and the low-water line. Both Andersen and the McCollums claim ownership of the property.

¶7    Although a long line of land transfers preceded this dispute, for our purpose, the first relevant transaction took place in 1971. At this time, Taylor and May Hale granted to Remi Monforton, a present appellant, and his wife, Betty Jo, Sections 15 and 22 of the Hale Ranch in Madison County, Montana, by warranty deed, described as follows:

2

That certain tract of land situated in the West 1/2 of Section 22, and the SW 1/4 of Section 15, T. 1 N., R. 4 W., M.P.M. Madison County, Montana, being more particularly bounded and described as follows, to wit: Commencing at the corner common to Sections 21, 22, 27 and 28, T. 1 N., R. 4 W., M.P.M., Madison County, Montana, a brass cap monument; thence N. 00° 07' 26" W. a distance of 79.75 feet on and along the section line between Sections 21 and 22 to the Point of Beginning, a point on the North right-of-way line of a county road; thence continuing N. 00° 07' 26" W. a distance of 651.25 feet *to a point on the right bank of the Jefferson River; thence meandering the right bank of the Jefferson River* N. 62° 17' 28" E. a distance of 255.93 feet; N. 87° 55' 03" E. a distance of 275.18 feet; N. 39° 56' 45" E. a distance of 521.75 feet; N. 33° 18' 38" E. a distance of 209.40 feet; N. 28° 59' 45" E. a distance of 474.47 feet; N. 39° 29' 28" E. a distance of 699.73 feet; No. 44° 33' 45" E. a distance of 463.17 feet; N. 12° 48' 15" E. a distance of 225.61 feet; due North a distance of 225.00 feet; N. 34° 22' 49" W. a distance of 115.11 feet; N. 14° 02' 10" W. a distance of 247.39 feet; N. 33° 01' 26" W. a distance of 119.27 feet; N. 30° 57' 50" W. a distance of 349.86 feet; N. 31° 25' 46" W. a distance of 316.43 feet; N. 20° 36' 54" W. a distance of 97.00 feet; N. 21° 02' 15" W. a distance of 336.65 feet; N. 34° 22' 49" W. a distance of 115.11 feet; N. 06° 50' 34" W. a distance of 251.79 feet; N. 05° 56' 49" E. a distance of 281.22 feet to the point of curvature of a curve to the right having a radius of 210.00 feet; thence on and along said curve a distance of 321.06 feet; thence S. 86° 27' 19" E. a distance of 159.35 feet to the point of curvature of a curve to the left having a radius of 340.00 feet; thence on and along said curve a distance of 369.47 feet to the point of reverse curve of a curve to the right having a radius of 169.01 feet; thence on and along said curve a distance of 334.24 feet; thence S. 35° 24' 25" E. a distance of 104.08 feet to the point of curvature of a curve to the left having a radius of 170.00 feet; thence on and along said curve a distance of 243.82 feet; thence N. 62° 25' 05" E. a distance of 152.22 feet to the intersection with the north-south mid-section line of Section 15, T. 1 N., R. 4 W., M.P.M.; *thence leaving the right bank of the Jefferson River* on and along said north-south mid-section line of Section 15, S. 00° 26' 49" E. a distance of 198.75 feet to the one-quarter corner common to Sections 15 and 22, T. 1 N., R. 4 W., M.P.M., a brass cap monument; thence S. 00° 21' 34" E. a distance of 2985.33 feet on and along the north-south mid-section line of Section 22, to the intersection with the north right-of-way line of a county road; thence on and along said right-of-way line S. 62° 12' 12" W. a distance of 3.83 feet; thence S. 51° 19' 22" W. a distance of 230.63 feet; thence S. 30° 22' 05" W. a distance of 313.79 feet; thence S. 36° 04' 00" W. a distance of 697.76 feet; thence S. 42° 15' 58" W. a distance of 281.23 feet; thence S. 53° 53' 30" W. a distance of 533.42 feet; thence S. 55°

3

12' 19" W. a distance of 555.43 feet; thence S. 55° 26' 50" W. a distance of 583.96 feet; thence S. 63° 17' 28" W. a distance of 153.34 feet; thence S. 89° 57' 30" W. a distance of 204.74 feet to the Point of Beginning, said tract of land containing 123.745 gross acres, the net platted area being 120.714 acres. [*See* attached Map A.] [Emphasis added.]

¶8 The Monfortons divided this tract of land sitting on the south bank of the Jefferson River in order to sell residential lots–thus, creating the Box Lazy L Ranches Subdivision. The Monfortons had the subdivision surveyed by James Spring, instructing him to survey lots all the way to the Jefferson River; they then filed the Certificate of Survey with the Madison County Clerk and Recorder. The Monfortons sold Lots 15, 16, 17, and 18 to the Gilberts, who in turn sold those lots to Andersen in 1980 and 1987. Lots 16, 17, and 18 sit on the south shore of a bend in the Jefferson River. The disputed property consists of 11.14 acres of land sitting between the high-water line (the river bank) and the low-water line.

¶9 Eventually, the Monfortons sold the remainder of the original ranch, excepting out various properties, including Andersen's tracts. This remainder of land, located to the east of Andersen's property, then went through a series of owners, until Valerie McCollum acquired it in 1995. McCollum then conveyed the land to Appellant McCollum, LLC.

¶10 In 1999, McCollum, LLC, hired a surveyor, Donald Schauber, to survey and subdivide property in order to adjust a boundary with some neighbors, the Wisners. Schauber prepared Certificate Survey No. 1349-AE, showing property belonging to McCollum, LLC, as Tract B, and the land to the east owned by the Wisners, as Tract A. (*See* attached Map B.) Andersen's land sits to the west of the McCollum property. According to Schauber's survey, Tract B encompasses (in addition to land of no concern to Andersen) the

4

disputed 11.14 acres north of Andersen's Lots 16, 17, and 18–that is, the land between the high-water line and the low-water line on the south shore of the Jefferson River. In creating the survey, Schauber looked to the original description (from the Hales to the Monfortons), which he interpreted as granting Andersen a fixed boundary on the north side of Andersen's property along the high-water line. Andersen knew nothing of Schauber's survey at the time it was commissioned, and believed he owned the 11.14 acres that Schauber interpreted as belonging to McCollum, LLC. McCollum, LLC, on the other hand, claims it owned the 11.14 acres before commissioning Schauber's survey and therefore did not find it necessary to take action against Andersen to acquire title to the land.

¶11 McCollum, LLC, hired an examiner to research and determine if title problems existed with Schauber's survey of the land depicted in Certificate Survey No. 1394-AE. The examiner discovered a title problem with a small triangle-shaped piece of property that did not include the disputed 11.14 acres. Upon the examiner's recommendation, the McCollums and the Wisners brought a quiet title action against Ted Dow Lewis and Delta H. Lewis over the small triangle-shaped land. Again, this land did not include the disputed 11.14 acres. According to the McCollums, they did not take action with regard to the disputed 11.14 acres because of their belief that they already owned the land.

¶12 The title action for the triangle-shaped piece of land did not name Andersen, nor was he served. After performing a "diligent search and inquiry" for all possible defendants, the McCollums and the Wisners served notice of the summons and complaint to all unknown defendants through publication in the *Madisonian,* a newspaper published in Madison

5

County, Montana, for five consecutive weeks. Andersen claims to have been ignorant of this quiet title action–until the advent of the present litigation. The District Court entered a judgment and decree quieting title to the property described in Certificate of Survey No. 1349-AE to McCollum, LLC, and the Wisners. This property included Tract B, encompassing the disputed 11.14 acres.

¶13 The legal description of the Box Lazy L Ranches Subdivision, as quoted above, describes the high-water line as the boundary of Lots 16, 17, and 18. The legal description of the remainder of the original ranch, ever since it was sold by the Monfortons, has included an identical description of the southern boundary between the ranch and Lots 16, 17, and 18. In 2000, claiming ownership of the 11.14 acres, McCollum, LLC, conveyed Tract B to Appellant Jefferson River Ranches, LLC, which then in turn conveyed Tract B to Jefferson River Ranches Homeowners' Association, Inc.

¶14 Andersen brought suit against Appellants claiming ownership of the disputed land. The District Court held that a meander line defines Andersen's property, and therefore he owns the 11.14 acres in dispute. The court granted summary judgment in favor of Andersen.

## STANDARD OF REVIEW

¶15 We review a grant of summary judgment *de novo*. We apply the same criteria as the district court according to Rule 56, M.R.Civ.P. *Rolison v. Bozeman Deaconess Health Services, Inc.*, 2005 MT 95, ¶ 13, 326 Mont. 491, ¶ 13, 111 P.3d 202, ¶ 13. Summary judgment shall be granted if the evidence filed with the court "show[s] no genuine issue of

6

material fact exists and the moving party is entitled to judgment as a matter of law." *Rolison*, ¶ 13.

**DISCUSSION**

**ISSUE ONE**

*Whether Andersen's deed indicates that he does not own the land adjacent to his property between the high-water and low-water lines.*

¶16     Andersen and the McCollums (via their entities) claim ownership to the 11.14 acre stretch of land sitting between the high-water and low-water lines of the Jefferson River, just north of Andersen's property and northwest of the McCullom property. The District Court's summary judgment opinion held that a meander line defines Andersen's property, and that he therefore owns the 11.14 acres in dispute. We agree with the District Court.

¶17     Before addressing the lower court's conclusion regarding the facts of this case, we must first address the definition and purpose of "meander lines."

¶18     Black's Law Dictionary states:

> **Meander lines**.  Lines run in surveying particular portions of the public lands which border on navigable rivers, *not as boundaries of the tract*, but for the purpose of defining the sinuosities of the banks of the stream, and as the *means of ascertaining the quantity of land* in the fraction subject to sale, and which is to be paid for by the purchaser.  In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows that *the water-course, and not the meander line as naturally run on the ground, is the boundary*.

BLACK'S LAW DICTIONARY 980 (6th ed. 1990) (emphasis added).

¶19    In other words, a surveyor utilizes a meander line when he or she wants to show that the navigable river serves as the property boundary.  If a meander line does not appear in the description, the boundary is fixed–i.e., it does not alter with the river's shifting bank.

¶20    The use of meander lines has been the cause of some debate over the years.  In the 1868 case, *Railroad Company v. Schurmeir* (1868), 74 U.S. 272, 7 Wall. 272, 19 L.Ed. 74, the Supreme Court was forced to address the meaning and purpose of meander lines in response to a dispute over whether the described boundary was fixed or dependent on the river's edge.  Even though the description included a meander line, counsel for the railroad company argued that the property had a fixed boundary because the description included metes and bounds.  *Schurmeir*, 74 U.S. at 278.  The Court disagreed, holding that "the river . . . not the meander-line, is the boundary of the lot . . ."  *Schurmeir*, 74 U.S. at 286.  The Court explained that "[m]eander-lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream."  *Schurmeir*, 74 U.S. at 286-87.  Meander lines, according to the Court, are a "means of ascertaining the quantity of the land in fraction subject to sale, and which is to be paid for by the purchaser."  *Schurmeir*, 74 U.S. at 287.  In other words, while meander lines contain specific measurements, permitting an exact quantity of land to be determined for sale, they are  meant to define the boundary as moving with the river's shifting bank.

¶21    The Ninth Circuit noted several decades later in *United States v. Boynton* (9th Cir. 1931), 53 F.2d 297, 298, that "a meander line, as carried into field notes, shows corners,

8

posts, monuments, and courses." The Circuit went on to hold that such a survey line does not become "definite and fixed" unless the drafter took some action or used words "in the instrument of conveyance, which will show that the grantor has agreed that such line shall be considered as having more than its assigned character; it must be agreed that it indicates a definite boundary." *Boynton*, 53 F.2d at 298. Citing *Boynton* as precedent, the Ninth Circuit held in *City of Los Angeles v. Borax Consolidated Limited* (9th Cir. 1935), 74 F.2d 901, 902, that even though the plat "did not distinctly state that the lines of the patent were meander lines," it was clearly inferable from the description.

¶22     This Court long ago recognized that "[t]he general rule adopted by state and federal courts is that meander lines run in surveying fractional portions of the public lands bordering upon navigable bodies of water are not run as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the lake or river . . . . The title of the grantee is not limited to such meander lines; *the waters themselves and not the meander line constitute the real boundary*." *Faucett v. Dewey Lumber Co.* (1928), 82 Mont. 250, 257, 266 P. 646, 648 (citations omitted; emphasis added). The same is true regarding meander lines describing non-navigable bodies of water, except that then ownership extends to the middle of the stream, not just to the low-water line. *Bode v. Rollwitz* (1921), 60 Mont. 481, 491, 199 P. 688, 691.

¶23     In addition to the above relevant law, we find a 1992 decision from the Texas Court of Appeals useful:

> [T]he surveyor may run a meander line, *a series of course and distance calls* which follow the river or other natural object or monument as closely as is

9

practically possible for purposes of calculating the amount of land conveyed. When a meander line is used, however, the natural object or monument (e.g., a river, the seashore, or an identifiable terrain feature) will control over the specific calls for course and distance. Thus, meander lines of surveys of land adjacent to or bounding upon a stream are not to be considered as boundaries, but they are to follow the general course of the stream, which in itself constitutes the real boundary. . . . Where the natural object is clearly referred to in the patent or deed as a boundary of the land conveyed, specific course and distance calls will be construed to be a meander line.

*Texas v. Brazos River Harbor Navigation District* (Tex. Ct. App. 1992), 831 S.W.2d 539, 542-43.

¶24    Appellants argue that these interpretations of meander lines only apply to government surveys, and that in private surveys meander lines raise only a presumption. However, after considering relevant precedent, we find the rule to apply to both government and private surveys. *The Pointe, LLC v. Lake Mgmt. Ass'n, Inc.* (Tenn. Ct. App. 2000), 50 S.W.3d 471, 477 (quoting *Holbert v. Edens* (1880), 73 Tenn. 204, 209-10) ("'The general rule undoubtably is that a call for the stream or bank . . . and then with the stream according to its meanders, will carry the boundary *ad filum aquae* [to the thread of the stream], whether the grant be by the State or a private individual'"); *Ford v. Butte County* (Cal. App. Ct. 1944), 145 P.2d 640, 643-44 (stating that rules applying to meander lines in government surveys also apply to private surveys).

¶25    Before addressing the facts of this case, we note the following relevant Montana statutory law:

> **70-16-201.  Owner of land bounded by water.**  Except where the grant under which the land is held indicates a different intent, the owner of the land, when it borders upon a navigable lake or stream, takes to the edge of the lake or

10

> stream at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream.

In other words, Montana statute dictates that property between the low-water line and the high-water line belongs to the party owning property to the high-water line, unless a grant specifically indicates otherwise.

¶26 Turning to the facts of this case, the legal description of Andersen's property references the Jefferson River bank three times to define the boundaries of the course and distance calls, and characterizes the border as "meandering." The surveyor defined the boundary as running ". . . to a point on the right bank of the *Jefferson River*; thence *meandering the right bank* of the *Jefferson River* . . . [series of calls and distances] thence leaving the right bank of the *Jefferson River*." As noted above, Montana statute dictates that unless the grant indicates a different intent, the owner of land bordering upon a navigable stream, takes to the edge of the stream at low-water line. Section 70-16-201, MCA. As we noted from previous case law, the use of metes and bounds in the description does not indicate an intent contrary to the statutory presumption of low-water line.

¶27 Given that the deeds describing and conveying Lots 16, 17, and 18 refer to the plat, and given that the plat uses meander lines, we determine that Andersen owns the disputed 11.14 acres at issue here that is adjacent to Lots 16, 17, and 18 between the high-water and low-water lines of the Jefferson River. The deeds and the plat do not "indicate" a contrary intention of the grantor. Section 70-16-201, MCA.

¶28 Appellants' arguments to the contrary are not persuasive. First, Appellants argue that when the land outside of a meander line is greatly in excess of the land covered by a grant

11

the meander line will be treated as the boundary. This rule does not apply here, however, because the acreage of Lots 16, 17, and 18 is larger than the disputed land. In addition, Appellants contend that when boundaries are determined by location, and not monument, courses and distances control. The problem with this argument is that the references to the Jefferson River in the plat illustrate that the boundaries are, at least in part, determined by monument. *See Sowerwine v. Nielson* (Wyo. 1983), 671 P.2d 295, 299 ("a 'monument' is a natural or artificial physical object on the ground which helps establish a line. Natural monuments are such things as trees, rivers, stone outcroppings, creeks, and land features").

¶29 In addition, Appellants also cite to the depositions of various parties, including Remi Monforton, the original grantor of the subdivision, in support of their argument that the intention of the grantor was to set a "definite boundary" for the property and not use the river as the boundary. Appellants also contend that Andersen has not paid property taxes on the disputed property, while the McCollums have. However, § 70-16-201, MCA, does not allow consideration of evidence outside of the four corners of the granting document. In applying the statute, we must confine our review to the "grant under which the land is held." Since we have determined that "the grant under which the land is held" does not indicate an intention contrary to granting Andersen the land below the high-water line, the extrinsic evidence is irrelevant. *Tester v. Tester,* 2000 MT 130, ¶ 25, 300 Mont. 5, ¶ 25, 3 P.3d 109, ¶ 25 (citing *Ferriter v. Bartmess* (1997), 281 Mont. 100, 103, 931 P.2d 709, 711) ("[a]n unambiguous deed must be interpreted according to its language as written, without resort to extrinsic evidence of the grantor's intent").

12

¶30 Appellants further argue that some of the property in dispute was created through avulsion occurring since the time the land was surveyed and that, as a result, Andersen does not hold title to the property. Since this argument is raised for the first time on appeal, we do not address it. *State v. Weaselboy*, 1999 MT 274, ¶ 16, 296 Mont. 503, ¶ 16, 989 P.2d 836, ¶ 16.

## ISSUE TWO

¶31 *Whether Andersen is bound by the prior quiet title decree adjudicating McCollum, LLC, as the owner of the disputed property.*

¶32 The District Court concluded that Andersen was not bound by the prior quiet title decree concerning Tract B because Andersen was never properly served, and thus the court in the prior action lacked jurisdiction over him. We agree with this conclusion.

¶33 Andersen may collaterally attack the decree if he was not properly served. *Joseph Russell Realty Co. v. Kenneally* (1980), 185 Mont. 496, 501, 605 P.2d 1107, 1110. Appellants contend that Andersen was properly served by publication. Under § 70-28-104, MCA, an "unknown claimant" may be joined as a defendant in a quiet title action. However, under § 70-28-107, MCA, service of such a defendant must comply with Rule 4, M.R.Civ.P. Rule 4(D)(5)(c), M.R.Civ.P., governs service by publication upon unknown claimants. It requires that an affidavit be filed that states:

> [T]he affiant has made diligent search and inquiry for all persons who claim, or might claim any right, title, estate, or interest in, or lien, or encumbrance upon, such property, or any thereof, adverse to plaintiff's ownership, or any cloud upon plaintiff's title thereto, whether such claim or possible claim be present or contingent . . . and that the affiant has specifically named as

13

defendants in such action all such persons whose names can be ascertained
. . . .

¶34     In the quiet title action at issue here, the affiant was the McCollums' attorney. The attorney stated that he had made a "diligent search and inquiry" for all possible claimants to Tract B. The requirement for a "diligent search and inquiry" is not a mere formality but one that requires strict compliance. *See Joseph Russell*, 185 Mont. at 502, 605 P.2d at 1110 (discussing service by publication upon corporations). As stated above, Andersen's lots are directly to the west of the McCollums', and it is undisputed that Andersen's land borders on Tract B. It is also undisputed that at the time of the action, the McCollums knew Andersen and that they could see Andersen's house from their property. The McCollums did not inspect Andersen's property in preparing to quiet title, but instead asked a title company to inquire into what parties they should name in the action. Andersen did not learn of the action until after he filed the present lawsuit.

¶35     Appellants argue that the McCollums did not specifically name, and personally serve, Andersen because they had no way of knowing that Andersen had a claim to part of Tract B. The District Court held that the McCollums should have known of the claim because the deed to Andersen's property is a matter of public record. Appellants contend that the McCollums could not have known that Andersen's deed would be interpreted to give him ownership of the disputed 11.14 acres. However, Rule 4, M.R.Civ.P., does not require "knowledge" of ownership but merely knowledge that a "possible claim be present or contingent." Given the language of Andersen's deed and of the subdivision's recorded plat,

14

as well as the McCollums' knowledge of Andersen's proximity to Tract B, we affirm the District Court's conclusion that the McCollums did not perform a "diligent search and inquiry for all persons who claim, or might claim" a right to land within Tract B. Therefore, service by publication was not sufficient service with which to gain personal jurisdiction over Andersen and he is not bound by the prior decree. *Fonk v. Ulsher* (1993), 260 Mont. 379, 383, 860 P.2d 145, 147 ("[i]mproper service undermines a court's jurisdiction, and a default judgment subsequently entered is thereby void").

¶36 Appellants argue that *Brown v. Tintinger* (1990), 245 Mont. 373, 801 P.2d 607, *overruled on other grounds by Wareing v. Schreckendgust* (1996), 280 Mont. 196, 205-06, 930 P.2d 37, 43, compels a different result, but that case is distinguishable. There, the defendants had not been named or personally served in a previous quiet title action. The decree in the previous action extinguished an easement the defendants claimed to have held. *Brown*, 245 Mont. at 376, 801 P.2d at 608. We concluded that there was no evidence that the party who had brought the quiet title action would have known of the defendants' use of the property. *Brown*, 245 Mont. at 376, 801 P.2d at 609. In contrast to a claim of an easement, Andersen's claim is to ownership of the land. Further, there is ample evidence that the McCollums had reason to know of Andersen's possible claim to the property.

### ISSUE THREE

¶37 *Whether certain portions of Appellant's Reply Brief should be stricken.*

¶38 After the close of briefing, Andersen moved that certain portions of Appellant's Reply Brief be stricken because it makes references to facts not in the record and makes arguments

15

which are misstatements and mischaracterizations of Andersen's arguments. Given that we have held for Andersen on all issues, we determine that we need not address Andersen's motion.

## CONCLUSION

¶39    We affirm the judgment of the District Court.


/S/ W. WILLIAM LEAPHART


We Concur:


/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA O. COTTER
/S/ JOHN WARNER

/S/ JEFFREY M. SHERLOCK
Honorable Jeffrey M. Sherlock, District
Judge, sitting in place of Justice Brian Morris

16

# BOX LAZY L RANCHES

## A SUBDIVISION

SITUATED IN THE W1/2 SEC. 22 & THE SW1/4 SEC. 15,
T.1 N., R.4W., P.M.M., MADISON COUNTY, MONTANA

FOR: REMI MONFORTON — BY: CHRISTIAN, SPRING, SIELBACH & ASSOCIATES
WHITEHALL, MONTANA — BILLINGS, MONTANA

MARCH, 1971

SCALE: 1"=200'

NW CORNER SECTION 22,
T.1 N., R.4W., P.M.M.
BRASS CAP MONUMENT

N 1/4 CORNER SECTION 22,
T.1 N., R.4W., P.M.M.
BRASS CAP MONUMENT

W 1/4 CORNER SECTION 22,
T.1 N., R.4W., P.M.M.
BRASS CAP MONUMENT

POINT OF BEGINNING

SW CORNER SECTION 22,
T.1 N., R.4W., P.M.M.
BRASS CAP MONUMENT

S 1/4 CORNER SECTION 22,
T.1 N., R.4W., P.M.M.
BRASS CAP MONUMENT

COUNTY ROAD R/W LINE

60' WIDE EASEMENT
10' WIDE EASEMENT

MAP A

17



CERTIFICATE OF SURVEY NO. _____

SURVEY TO CREATE AN

Agricultural Tract in the S.B 1/4 and SW 1/4 9" Section 18,
Township 1 North, Range 4 West, P.M.M., Madison County, Montana.

SE 1/4
SECTION 15
T.1N., R.4W.

Jefferson River

TRACT B
28.40 ACRES
(Agricultural Tract)

TRACT A
35.45 ACRES
C.O.S. NO.362

BOX LAZY L RANCHES

15
16
17
18

DEPOSITION
EXHIBIT

MAP B

Justice Jim Rice dissenting.

¶40    The Court finds that the property survey at issue "uses meander lines" and from that factual predicate concludes that the disputed property is subject to the long-established rule, first stated by the United States Supreme Court in 1869 and cited by this Court in *Faucett*, to the effect that a meander line does not constitute a property's boundary, but rather, the water does. I submit that neither the Court's factual predicate nor its application of the meander rule to the property dispute here is correct.

¶41    The roots of the meander rule can be traced to Congressional enactments of the 1780s and 1790s providing the methods by which the territories ceded to the national government by the several states would be divided into townships and tracts. *See Railroad Company v. Schurmeir* (1869), 74 U.S. 272, 7 Wall. 272, 19 L.Ed. 74. The purpose of the rule was to create a convenient mechanism for determining the quantity of government land to be sold— with the land below the meander line being free of charge. As the United States Supreme Court has explained, which we noted in *Faucett*, "[i]t has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream or other body of water." *Hardin v. Jordan* (1891), 140 U.S. 371, 380, 11 S.Ct. 808, 35 L.Ed. 428. Thus, the rule was originally a bureaucratic convenience, explained by the part of the rule which the Court has spliced out of the quotation of it in ¶ 20: ". . . for the purpose of defining the sinuosities of the banks of the lake or river, *in order to ascertain the exact quantity of the upland to be charged for*." *Faucett*, 82 Mont. at 257, 266 P. at 648

(emphasis added). The amount of land and the purchase price was thus determined based upon the meander line, but, as the Court correctly notes, generally—but subject to an important exception discussed herein—the actual property line extended to the water itself.

¶42 Understanding the reason for this rule becomes important in this case. A distinction was made between the meander line and the actual property line out of a very practical concern: "The reason for this rule is that it is not possible for a surveyor to delineate precisely, in a series of straight lines, the meanders of a stream or body of water." *Board of Com'rs v. Rathborne Land Co., Inc.* (La. App. 2004), 868 So.2d 928, 931. Thus, meander lines were not thought to be accurate indicators of property boundaries, and were not generally used as such. "[F]or various reasons, meander lines are inherently inaccurate, meant only to approximate the course of a water body." George J. Morgenthaler, *Surveys of Riparian Real Property: Omitted Lands Make Rights Precarious*, 30 Rocky Mtn. Min. L. Inst. 19-1, 19-10 & nn.19-21 (1984). Thus, the purpose of the meander rule, as this Court has explained, is to "ascertain the exact quantity of the upland to be charged for," *Faucett*, 82 Mont. at 257, 266 P. at 648, or, as the United States Supreme Court has explained, the rule is "the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser." *Schurmeir*, 74 U.S. at 287.

¶43 In ¶ 27 the Court concludes that the official survey in this matter "uses meander lines." Unfortunately, the Court fails to acknowledge the evidence herein which demonstrates that the reason for the rule—the need to "ascertain the exact quantity" of land purchased—does not exist, making the rule inapplicable.

20

¶44     Although a meander line is not meant to set the boundary of a tract, but is "meant only to approximate the course of a water body," the line in question here, and the plat as a whole, leaves no doubt that the line was designed to constitute the boundary of the tracts. The survey sets a precise, point to point, metes and bounds description of every piece of the entire circumference of the property. Each point, even those on the River's bank, is given a precise location. Each separate line is point to point. Each curve within the lines, even those along the Jefferson River, is calculated by radius and measured in length. The property lines around each individual lot are measured and set. *And, critically, the specific acreage of each lot is calculated and set forth on the plat itself.* (See attached plat.) Thus, there is no need whatsoever to "ascertain the exact quantity of the upland to be charged for" because the exact quantity has not been left to chance. To the contrary, the survey has precisely calculated the exact quantity of land which Anderson purchased.

¶45     Thus, the survey line in question is not a "meander line" but, rather, a boundary line. Consequently, the survey clearly "indicates a different intent," as provided in § 70-16-201, MCA, and the purchaser does not take to the river. How can a purchaser extend his property to the water by virtue of a claimed "meander line" when the purchase price he paid was based on specifically calculated acreage? *None* of the authority cited by the Court would allow a purchaser to do so.

¶46     To be sure, the survey does use the word "meandering" on one occasion within its legal description of the property, and makes several references to the Jefferson River. That is an insufficient basis, however, to turn a precisely surveyed boundary line into a meander

line, where the survey itself left no purpose for a meander line to fill. Although the survey uses the word "meandering" as an additional descriptive of the location of the property's boundary line, the survey does not default to the meander line to *set* the property's boundary line. No part of this property has been left undetermined, or somehow contingent upon the vagaries of a flowing river. This becomes apparent visually when one views the plat attached hereto.

¶47    The meander rule was to be applied in the absence of a survey to "delineate precisely, in a series of straight lines, the meanders of a stream or body of water." *Rathborne,* 868 So.2d at 931. That is clearly not the case here. Here, a survey was painstakingly completed which left no part of the property boundaries to chance. Though reference was made to the Jefferson River, noting at what points the property line intersected, traversed and departed from the bank of the River, the property line "meandered" the River in a colloquial sense only; that is, the River's "meander line" was not used to create the boundary. That was done by specific surveying calculations and each lot's acreage was carefully determined in advance of the sale. Thus, this is not a survey premised upon a meander line. As such, the meander rule is not applicable here for purposes of determining the property's boundaries.

¶48    Further, even if the meander rule did apply here, the rule, considered in its entirety, would not operate to grant the additional property to Respondent. As noted above, there are exceptions to the rule's operation, one of which is at issue here. In *Producers Oil Co. v. Hanzen* (1915), 238 U.S. 325, 35 S.Ct. 755, 59 L.Ed. 1330, the United States Supreme Court

22

reviewed its many cases applying the meander rule since first announcing it in *Schurmeir* in 1869, and summarized the entire meander rule as follows:

> [These cases] unquestionably support the familiar rule relied on by counsel for the Oil Company that in general meanders are not to be treated as boundaries and when the United States conveys a tract of land by patent referring to an official plat which shows the same bordering on a navigable river the purchaser takes title up to the water line. *But they no less certainly establish the principle that facts and circumstances may be examined and if they affirmatively disclose an intention to limit the grant to actual traverse lines these must be treated as definite boundaries. It does not necessarily follow from the presence of meanders that a fractional section borders a body of water and that a patent thereto confers riparian rights*.

*Producers Oil*, 238 U.S. at 339 (emphasis added). *See also Schultz v. Winther* (Wisc. 1960), 101 N.W.2d 631, 636 ("The general rule is subject to exceptions. Circumstances may show that what appears to be a meander line rather than the shore of a body of water some distance away was intended as a boundary. The area of land between the meander line and the actual shore has been considered *a circumstance bearing upon the question of intent*." (Emphasis added.)).

¶49    Regarding the question of intent in this case, although there is clear testimony that Monfortons' expressed intention was to create definite surveyed boundaries, and not default to a "river boundary," I do not believe it is necessary to look to such evidence in order to determine intent, and therefore, I believe summary judgment is appropriate—in favor of Appellant. As the Court correctly notes in ¶ 29, intent is determined by first looking to the

23

documents themselves, but unfortunately, the Court then yields to the temptation to include references to extrinsic evidence that favors its decision.[1]

¶50     From a proper review of the documents, discussed above, there can be no question that the intent was to create unmistakable property lines and lots of specific size, because that is what the survey did.  And thereafter, each deed incorporated by reference the specific property dimensions and acreage.  Consequently, the meander rule is not applicable—it cannot be employed in order to disregard surveyed property lines and acreage calculations.

¶51     The Court, without consideration of the long history and governmental purpose of the meander rule, applies it to private transactions as well.  *See* ¶ 24.  It is a poor policy choice. We are now presuming that private persons also give away valuable riparian land without compensation, a rule of convenience for the government in yesteryear, but one of foolishness today.  While this may affect future cases, it does not change the correct analysis here, as the meander rule simply should not apply.

¶52     I would reverse.

                                        /S/ JIM RICE

---

[1]See, for example, ¶ 8, where the Court ascribes to the Monfortons an instruction to their surveyor to "survey lots all the way to the Jefferson River."

